CALPINE CORPORATION, Plaintiff,

v.

The BANK OF NEW YORK and
Wilmington Trust Company,
Defendants.

C.A. No. 1669–N.

Court of Chancery of Delaware,
New Castle County.

Submitted Nov. 17, 2005.

Decided Nov. 22, 2005.

Edmond D. Johnson, Peter B. Ladig, The Bayard Firm, Wilmington, DE; Robert P. Haney, Jr., Covington & Burling, New York City, for Plaintiff.

M. Duncan Grant, Pepper Hamilton, L.L.P., Wilmington, DE; James Gadsden, William H. Sloane, Karl Schaffer, Carter Ledyard & Milburn, L.L.P., New York City, for Defendant The Bank of New York.

Bernard G. Conaway, Sheldon K. Rennie, Fox Rothschild, L.L.P., Wilmington, DE; Joseph F. Ryan, Steven B. Levine, Lisa M. Kelsey, Robert L. Harris, Brown Rudnick Berlack Israels, L.L.P., Boston, MA; Edward S. Weisfelner, Sigmund S. Wissner–Gross, Brown Rudnick Berlack Israels, L.L.P., New York City, for Defendant Wilmington Trust Company as First Lien Indenture Trustee.

Richard D. Allen, Robert J. Dehney, S. Mark Hurd, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Laurence Greenwald, Robin Keller, Wendell H. Adair, Stroock & Stroock & Lavan, L.L.P., New

York City, for Intervenor Wilmington Trust Company as Second Lien Indenture Trustee.

## OPINION

STRINE, Vice Chancellor.

This is the post-trial opinion in an expedited case involving a dispute between noteholders (through an Indenture Trustee for two different series of notes, the "First" and "Second Lien Notes") and the issuer of the Notes, Calpine Corporation ("Calpine"). Calpine operates natural gas-fueled power plants that generate electricity. This litigation centers on Calpine's plans for the use of approximately $852 million in net proceeds from the sale of substantially all of its oil and natural gas assets to Rosetta Resources, Inc. on July 7, 2005 (the "Rosetta Sale"). The "Rosetta Assets" that Calpine sold were "Designated Assets" under important instruments protecting its Noteholders. When the Rosetta Assets were sold, the "Rosetta Proceeds" therefore were placed into a control account and could only be used for certain purposes.

Calpine hoped to use the bulk of the $852 million in the Rosetta Proceeds to retire all of its First Lien Notes through a tender offer offering to pay the First Lien Noteholders par plus accrued interest. This use was mandated contractually by the indenture governing Calpine's first lien series of notes (the "First Lien Indenture"). Rather than receiving tenders from all of the First Lien Noteholders, only $139 million of the $785 million in First Lien Notes were tendered,[1] all of which Calpine repurchased. This left Cal-

pine holding $709 million in Rosetta Proceeds.

Calpine then embarked on purchases of natural gas for burning in its power plants. To accomplish those purchases, Calpine used the form contract typically used by sellers and purchasers of extracted natural gas—the Base Contract for the Purchase and Sale of Natural Gas promulgated by the North American Energy Standards Board ("NAESB")—as its foundational document (a "NAESB form contract").[2] In variance with its prior practice, however, Calpine modified its approach to purchasing natural gas by drafting the contracts so that it would pay an immediate price for the gas it purchased, take title upon that payment, and keep that gas in storage until it (or gas of similar quality) was delivered to Calpine within the brief contract term. The price that Calpine ultimately paid typically was to be determined by price movements in the spot market during the period up to delivery; moreover, if the seller failed to deliver all the purchased gas, Calpine's remedy was simply a cash payment in the amount necessary to cover through other gas purchases. Calpine had no right to insist on a remedy involving the actual delivery of the precise amount of gas to which it supposedly held title.

Calpine structured the contracts in this manner in order to argue that its purchase of natural gas constituted a purchase of Designated Assets, a permissible use of the Rosetta Proceeds under the indentures for the Second Lien Noteholders (taken together, the "Second Lien Indenture") once Calpine had made a qualifying tender offer to the First Lien Noteholders. The term Designated Assets in the First and

---

1. With accrued interest, Calpine paid approximately $143 million to repurchase approximately $139 million in face amount of First Lien Notes.

2. North American Energy Standards Board, General Terms and Conditions, Base Contract for Sale and Purchase of Natural Gas, NAESB Standard 6.3.1, April 19, 2002.

Second Lien Indentures broadly refers to "all geothermal energy assets ... and all ... Gas Reserves ... but excluding (i) any geothermal energy assets that are both unproven and undeveloped and (ii) contracts for the purchase or sale of natural gas and natural gas supplied under such contracts." After the tender offer closed, Calpine spent $313 million of the Rosetta Proceeds on natural gas for burning in its power plants and certified to The Bank of New York ("BONY"), the relevant "Collateral Trustee," that these purchases were of Designated Assets.

Eventually, the Noteholders caught wind of Calpine's purchases and complained to BONY that Calpine's use of the Rosetta Proceeds to buy natural gas was impermissible because it involved the use of the Rosetta Proceeds for "contracts for the purchase or sale of natural gas and natural gas supplied under such contracts," and thus did not involve the purchase of Designated Assets. After that objection surfaced, BONY refused to further release any more of the Rosetta Proceeds to Calpine for purchases of natural gas. Calpine therefore brought this action against BONY, as Collateral Trustee, and the Wilmington Trust Company, as indenture trustee for both the First and Second Lien Noteholders (collectively, the "Indenture Trustees"), seeking a declaration that its past and proposed use of the Rosetta Proceeds to buy natural gas constitute permissible purchases of Designated Assets.

In this opinion, I conclude that Calpine's proffered interpretation of the relevant exclusion from the term Designated Assets is erroneous. By any measure, Calpine is using Rosetta Proceeds to buy "natural gas supplied under ... [a] contract[ ] for the sale or purchase of natural gas...." The term used in the exclusion is an obvious reference to a common in-

dustry term for the contracts used to buy and sell already-extracted natural gas. Calpine itself appears to have proposed this exclusion, in order to exclude from the definition of Designated Assets the trading activities of one of its subsidiaries. Notably, this subsidiary, Calpine Energy Services ("CES"), was the unit that made regular, large purchases of natural gas for burning in Calpine's power plants, and by this exclusion, Calpine therefore placed the gas received under those contracts outside the reach of Designated Assets.

The contracts that Calpine has entered with the Rosetta Proceeds are materially indistinct from the prior contracts its subsidiaries used to acquire natural gas for burning. Calpine has never considered these prior contracts, or the natural gas acquired under them, to be Designated Assets. The mere fact that Calpine restructured the recent contracts in order to take "title" to the purchased gas upon contracting and before delivery does not suffice to make those contracts anything other than what they are plainly labeled and obviously are: "contracts for the sale or purchase of natural gas and the gas supplied under such contracts." Calpine's use of the Rosetta Proceeds for this purpose was therefore impermissible and it may not proceed to make further purchases of this kind. Because the correct party to challenge the past purchases—the Second Lien Noteholders—did not seek redress for the past purchases until after discovery had closed and trial was imminent, I defer on the question of the appropriate remedy for Calpine's inappropriate use of $313 million of the Rosetta Proceeds although it is clear a fitting and reasonably prompt restorative remedy is in order.

### I. *Factual Background*

#### A. *The Notes*

In July and November 2003, Calpine issued $2.95 billion of Second Lien Notes,

governed by four substantially identical note indentures, collectively, the Second Lien Indenture. The Second Lien Notes issued July 16, 2003, included $500 million floating rate notes due 2007; $1.15 billion of 8.5% notes due 2010; and $900 million of 8.75% notes due 2013.[3] On November 18, 2003, Calpine issued the remaining Second Lien Notes, which were $400 million of 9.875% notes due 2011. The Second Lien Notes are secured by a second priority lien on substantially all of the assets of Calpine, including, but not limited to, Calpine's domestic oil and gas reserves, geothermal assets, and seven power plant assets; 100% of the stock and other equity interests of Calpine's first-tier domestic subsidiaries; and a pledge of Calpine's interests in certain of its subsidiaries (the "Collateral").

About fourteen months later, in September 2004, Calpine issued $785 million principal amount of 9.625% First Priority Senior Secured Notes due 2014, that is, the First Lien Notes.[4] The First Lien Notes are secured by a first priority lien on the Collateral and are governed by an Indenture similar in most relevant respects to the Second Lien Indenture. Wilmington Trust Company is the Indenture Trustee under both the First Lien Indenture and the Second Lien Indenture.

In conjunction with the issuance of Second Lien Notes, Calpine also entered into a Collateral Trust Agreement, pursuant to which BONY was appointed Collateral Trustee for the Second Lien Notes.[5] The Collateral Trust Agreement included a mechanism whereby the representatives of additional secured debt holders could become a party to the Collateral Trust Agreement by executing a Collateral Trust Joinder.[6] When Calpine issued the First Lien Notes, Wilmington Trust Company executed a Collateral Trust Joinder (the "Joinder Agreement" or "Joinder") by which it agreed to be bound by the terms of the existing Collateral Trust Agreement. By virtue of this Joinder, the First Lien Notes became "Priority Lien Debt"[7] under the Designated Asset Sale Proceeds Control Agreement (the "Control Agreement") and the Collateral Trust Agreement and were granted senior status in respect to priority of liens and repayment.

The Indentures, Collateral Trust Agreement, Joinder Agreement, and Control Agreement constitute an integrated set of contracts that operate in concert. Taken

3. The Second Lien Notes are unregistered securities, initially purchased and later resold by Goldman, Sachs & Co. ("Goldman Sachs") and certain financial institutions in a private placement pursuant to Rule 144A under the Securities Act of 1933. At the same time as the issuances of the Second Lien Notes, Calpine entered into $750 million of term loans due 2007 for which Goldman Sachs Credit Partners L.P. serves as Agent. The Goldman Sachs Term Loan Facility shares in the Collateral on a second lien basis and contains substantially similar terms to the Second Lien Indenture, including the definition of "Designated Assets" and Asset Sale Provisions.

4. The First Lien Notes are unregistered securities, initially purchased and later resold by Merrill Lynch & Co.

5. Originally, the Collateral Trust Agreement was entered into among Calpine, three of its subsidiaries, the Bank of Nova Scotia (as Agent under a $500 million Credit Agreement), Wilmington Trust Company (as Indenture Trustees), and Goldman Sachs Credit Partners L.P. See supra note 3. Calpine used a portion of the proceeds from the issuance of the First Lien Notes to retire completely the debt for which Bank of Nova Scotia served as Agent. Goldman Sachs Credit Partners has been notified of this action and to date has not sought to intervene.

6. Collateral Trust Joinder Art. 3, § 3.8.

7. The term "Priority Lien Debt" is used in all the documents and includes the First Lien Notes.

together, I refer to these various agreements at times as the "Instruments." The Instruments work together to ensure that Calpine only uses the pledged Collateral, in particular the Designated Assets, in a manner consistent with the promises it made to its creditors. Most relevant here, the Instruments harmonize the promises Calpine made to the First and Second Lien Noteholders in the First and Second Lien Indentures regarding the use of Designated Assets. Those promises are described next.

## B. *Designated Assets*

The Indentures are governed by New York law and contain provisions governing Calpine's use of the proceeds of certain assets, including sales of "Designated Assets." Designated Assets serve as the "primary security" for Calpine's obligations under the Indentures,[8] although Calpine had other valuable Collateral as of the time of issuance. Designated Assets is defined identically in the Indentures as:

> [A]ll geothermal energy assets (including any related extraction, processing or similar equipment and geothermal power plants) and all natural gas assets (including any related extraction, processing or similar equipment, other than natural gas power plants) owned by the Company or any of its Restricted Subsidiaries from time to time, including the equity interests of any Restricted Subsidiary owning any Designated Assets, but excluding (i) any geothermal energy that are both unproven and undeveloped and (ii) contracts for the purchase or sale of natural gas and natural gas supplied under such contracts.[9]

All the Instruments contain this same definition of the term Designated Assets.

The term Designated Assets first appeared on June 10, 2003 in a draft Description of the Notes in connection with the 2003 offering circular for the Second Lien Notes. It was July 1, 2003, when the exclusion in subpart (i) first appeared in another draft Description of the Notes. Then, on July 3, 2003, the exclusion in subpart (ii), which is the crux of this dispute (the "Exclusion"), first appeared in a draft of the Description of Notes in the offering circular that was circulated to multiple parties, including representatives of Calpine, its counsel Covington & Burling, and Latham & Watkins, counsel for Goldman Sachs in its capacity as initial purchaser of the Second Lien Notes. This July 3, 2003, draft of the definition of Designated Assets became the final definition used throughout the Instruments.

The Exclusion to Designated Assets was added late in the process of structuring the offering of Second Lien Notes after several drafts of the Description of Notes and of Designated Assets had already been reviewed and negotiated by counsel for Calpine and Goldman Sachs.[10] The evidence in the record indicates that the definition of Designated Assets was amended, however, at Calpine's request to exclude certain assets from becoming part of the Collateral and subject to the special reinvestment and use requirements imposed by the Instruments. Calpine's Chief Financial Officer ("CFO"), Robert Kelly, testified that although he did not take part in the negotiation and drafting of the language for Designated Assets that he did communicate a desire that Calpine be accorded "maximum flexibility" with re-

---

8. Kelly Dep. at 36–37; Tr. at 50–51.

9. First Lien Indenture § 1.01; Second Lien Indenture § 1.01.

10. Tr. at 205–206.

gards to reinvestment and use of all assets, including the Designated Assets.[11] Kelly testified that Calpine wanted excluded from the definition of Designated Assets ordinary course natural gas trading done by Calpine's trading subsidiary, CES: "[O]ne of the other rules [was] don't touch CES."[12]

It is worth highlighting that by carving out CES in this way, Calpine was excluding two important aspects of its day-to-day operations from the reach of the Indentures' restrictions on Designated Assets. One was CES's participation in the commodities market for natural gas as a trader, seeking to swap rights to buy or sell natural gas for a profit. The other, and interrelated one, was that CES was also the unit that acquired natural gas for burning in Calpine's own power plants.[13]

Although the contracts used by CES for this second purpose varied in ways, they used the NAESB form contract as a base and involved Calpine's acquisition of natural gas over a short-term period. Calpine most commonly paid upon receipt of the natural gas, based on the prices of the natural gas markets as of delivery, but sometimes paid an upfront price, which was adjusted for movements in the market price of natural gas after contracting. As Calpine notes, under each of these contracts, it took formal title to gas only upon delivery, although it had a contract right to receive deliveries of certain amounts of natural gas (or damages) upon contracting. These purchases for normal use were not trivial in amount, they involved some 100,000 transactions a year.[14]

Indeed, although Calpine had natural gas reserves of its own, almost all of its fuel needs were met by commodity purchases by CES. Calpine, through CES, purchased 93% of its natural gas from third parties to fuel its fleet of power plants before the Rosetta Sale, routinely utilizing the NAESB form contract.[15] Moreover, despite Calpine's use of some reserves for its own fuel needs, its reserves—which had a useful life of a decade or so—tended to preserve their value or increase in worth.[16]

In addition, Calpine's counsel who led negotiations in the Second Lien Notes transaction, Bruce Bennett of Covington & Burling, testified that he also expressed Calpine's desire to exclude CES's natural gas trading from the definition of Designated Assets and related restrictive provisions in the Instruments.[17] Thus, the Exclusion was a late amendment initiated by Calpine that was intended to carve-out from the special requirements imposed upon Designated Assets the contracts entered into by Calpine to buy or sell gas and the gas Calpine received under such contracts. The definition crafted for Designated Assets as used in the Instruments relating to the Second Lien Notes was later imported verbatim, without additional discussion, into the indenture for the November issuance of Second Lien Notes, and the following year, into the First Lien Indenture.

### C. Use of the Rosetta Proceeds

On July 7, 2005, taking advantage of favorable market conditions, Calpine

---

11. Tr. 15, 34, and 51. Kelly could not recall with whom at Goldman Sachs he specifically discussed this.

12. Tr. 14–15.

13. JX 13 at A–2 (including as an appendix Calpine's 10K for 2002).

14. Posoli Dep. at 18.

15. Posoli Dep. at 19.

16. Kelly Dep. at 41.

17. Bennett Dep. at 119.

closed a sale of substantially all of its domestic oil and natural gas reserves and related assets to Rosetta Resources, Inc. (i.e., the Rosetta Sale) in order to reduce its debt. Recognizing that the Rosetta Sale was a sale of Designated Assets, Calpine deposited the Rosetta Proceeds of approximately $852 million into the Designated Asset Sale Proceeds Account pursuant to its obligations under the Instruments.[18] The Instruments instruct Calpine on the permissible uses of the Rosetta Proceeds directing them first to the relevant provisions of the First Lien Indenture and then to the relevant provisions under the Second Lien Indenture.[19]

Calpine's options regarding the permissible uses of the Rosetta Proceeds, or other net proceeds from a sale of Designated Assets, can be described as a mandatory decision tree or waterfall: First, within 180 days after receipt of proceeds from the sale of Designated Assets in excess of $50 million, Calpine could use those proceeds to buy replacement Designated Assets. Thus, in this situation, the Rosetta Proceeds were available to Calpine for 180 days—until January 3, 2006—to purchase other assets that constituted Designated Assets.[20] If Calpine purchased replacement Designated Assets during this period, and after doing so more than $50 million in proceeds from the sale of Designated Assets remain (the "Excess Pro-

ceeds"[21]), Calpine had to make a tender to purchase the First Lien Notes at par plus accrued interest (a "Qualified Offer").[22] Likewise, if Calpine decided not to use the Rosetta Proceeds to purchase replacement Designated Assets, Calpine was required to make a Qualified Offer at the expiration of the 180-day period.

Assessing its options, Calpine forewent its 180-day period of opportunity to purchase replacement Designated Assets and moved directly to make a Qualified Offer to all holders of its First Lien Notes even before the closing of the Rosetta Sale. In its offering statement, which went out June 9, 2005, Calpine made plain that it was making the Offer because it was hoping to consummate a sale of Designated Assets and to use the proceeds to fund the Offer. Calpine did not disclose, however, its intention after closing the Qualified Offer to use any remaining Rosetta Proceeds to purchase gas and consume it immediately, much less that it would premise its right to do so on the mere fact that it would change its standard natural gas purchase contracts to obtain title upon contracting. The Qualified Offer was set to and did close on July 8, 2005, one day after Calpine received the Rosetta Proceeds. Of course, the holders of the First Lien Notes were not obligated to accept the Qualified Offer,[23] and to Calpine's surprise

---

18. The First Lien Indenture, § 4.10(a)(3), mandates that Calpine immediately deposit the net proceeds from a sale of Designated Assets as cash collateral into a segregated account held by BONY called the "Designated Asset Sale Proceeds Account." In addition, § 2.01(b) of the Control Agreement executed between Calpine and BONY also requires Calpine to promptly deposit into the Designated Asset Sale Proceeds Account all net proceeds of Designated Collateral, which is defined as all Designated Assets but excluding Canadian Gas Assets.

19. Section 4 of the Indentures governs Asset Sales, including the sale of Designated Assets.

20. First Lien Indenture § 4.10(c).

21. Under both the First Lien and Second Lien Indenture, "Excess Proceeds" is the term used to reference proceeds that remain.

22. First Lien Indenture § 4.10(d).

23. To the extent holders of First Lien Notes do not accept a Qualified Offer, Calpine retains the option to redeem such notes for a price which includes a make-whole prepay-

and disappointment, only $139 million in face amount of Notes were tendered, which Calpine then immediately repurchased.[24]

The low level of interest in the Qualified Offer to the holders of First Lien Notes left approximately $709 million in Rosetta Proceeds in the Asset Sale Proceeds Account. Again, the Instruments contemplate this eventuality and provide direction to Calpine on how to use proceeds from a sale of Designated Assets. The First Lien Indenture, anticipating that Excess Proceeds may remain even after a Qualified Offer to the holders of the First Lien Notes, provides that if this should occur, Calpine may use any Excess Proceeds for "any purpose not otherwise prohibited by this [First Lien] Indenture" and that the "amount of Excess Proceeds shall be reset at zero."[25] Although I later resolve the debate whether the First Lien Noteholders have any enforceable rights regarding the further use of the Rosetta Proceeds once this occurred, what should be understood as certain now is that at the point the Qualified Offer to the First Lien Noteholders closed, the restrictions in the Second Lien Indenture imposed on the use of Designated Assets kicked into effect.[26]

Under the Instruments (in particular, the Second Lien Indenture), after the Qualified Offer to the First Lien Noteholders, Calpine's options in regards to the Rosetta Proceeds were as follows: First, within 180 days after receipt—again, until January 3, 2006—the Rosetta Proceeds could be used to purchase other assets that constitute Designated Assets or used to pay down First Lien Notes (so-called Priority Lien Debt).[27] If the Rosetta Proceeds are not used to purchase replacement Designated Assets or repay First Lien Notes and Excess Proceeds remain (again, that exceed $50 million), Calpine must make a tender (a "Second Lien Qualified Offer"[28]) to purchase the Second Lien Notes at par plus accrued interest.[29] Similar to the requirements under the First Lien Indenture, should a Second Lien Qualified Offer result in further Excess Proceeds, Calpine may use any Excess Proceeds for "any purpose not otherwise prohibited by this [Second Lien] Indenture."[30] Thus, when the Indentures are read together, until Calpine has faithfully fulfilled its obligation to make a Second Lien Qualified Offer, the Rosetta Proceeds may only be used to acquire replacement Designated Assets or pay down First Lien Notes.

ment to defease such Notes or otherwise consensually repay them. *See* First Lien Indenture § 3.05 and Art. 8.

**24.** On the same day the Qualified Offer was set to close, Goldman Sachs Research issued a report entitled "Calpine: First Priority Notes Worth Much More to Calpine Than Just Par—Assigning Trading Buy Rating." Merrill Lynch & Co., who was coordinating the Qualified Offer to the First Lien Noteholders, commented internally on the report as having "thrown a bit of a wrench into the market today" and as "not helpful to a number of accounts that were 'on-the-fence' and thinking about tendering." JX 101.

**25.** First Lien Indenture § 4.10(d).

**26.** In addition to the Indentures, the Collateral Trust Agreement and the Control Agreement impose further restrictions on the use of proceeds from the sale of Designated Assets. *E.g.,* Collateral Trust Agreement Art. 3; Control Agreement § 2.01(c)(i)(A).

**27.** Second Lien Indenture § 4.10(c).

**28.** "Qualified Offer" will sometimes more generally be used to reference a tender to purchase Notes as required under either the First Lien Indenture or the Second Lien Indenture.

**29.** Second Lien Indenture § 4.10(d).

**30.** *Id.*

Calpine never intended to reach the stage when it would be required to launch a Second Lien Qualified Offer although the Excess Rosetta Proceeds well exceeded $50 million. Calpine did not want to do so because the Second Lien Notes were trading at a substantial discount to par and the Second Lien Indenture requires Calpine to repurchase the Second Lien Notes at par plus accrued interest. Launching a Second Lien Qualified Offer, therefore, would involve Calpine paying a substantial premium on the Second Lien Notes.

For this reason, Calpine instead decided to use the excess Rosetta Proceeds that remained after the Qualified Offer to the holders of the First Lien Notes to purchase what it claims are Designated Assets. During the period from approximately July 25, 2005 to August 31, 2005, Calpine executed ten contracts (the "Disputed Contracts") with several third-party suppliers to purchase natural gas for use as fuel in Calpine's power plants. In all but one of the Disputed Contracts, Calpine purchased natural gas or proposed to purchase natural gas pursuant to NAESB form contacts.

The NAESB form contract is widely used by participants in the natural gas industry as the standard form of agreement for the purchase and sale of natural gas across the North American market. It offers a standardized template of terms that facilitates purchases and sales while allowing counterparties to negotiate provisions such as price, quantity, location, and duration. The NAESB form contract includes: (i) a Base Contract for Sale and Purchase of Natural Gas; (ii) General Terms and Conditions; and (iii) a Transaction Confirmation for Immediate Delivery. Nine of the ten Disputed Contracts Calpine executed during this time utilized the NAESB form contract, which included execution of a confirmation that provides for Calpine to prepay for a quantity of gas at an estimated spot market price for the following month as of the date the transaction closes. The solitary contract among the Disputed Contracts that did not use the NAESB form contract used a type of contract substantially similar in its material terms to the NAESB one.[31]

In late July and throughout August 2005, BONY processed the ten requests made by Calpine for the release of $313 million in funds in the Sale Proceeds Account in order for Calpine to purchase natural gas in storage. The first indication that the use of Rosetta Proceeds could be contested came in mid-July 2005 when Kelley Drye & Warren ("Kelley Drye"), a law firm representing First Lien Noteholders holding a majority of the First Lien Notes, contacted the First Lien Trustee requesting, among other things, that they be hired as counsel for the First Lien Trustee. At least as early as July 22, Wilmington Trust Company requested that BONY provide an account balance for the Designated Asset Sale Proceeds Account. As of July 27, BONY had not responded, forcing Wilmington Trust to reiterate its request on that date.

In a letter dated August 5, 2005, Kelley Drye requested that BONY, as Collateral Trustee, inform them of withdrawals from the Designated Asset Sale Proceeds Account and that the First Lien Trustee permit no further withdrawals from that

31. The contract between Calpine and Coral Energy Resources, L.P. took the form of a Storage and Delivery Services Contract, which is a non-NAESB form contract. *See* Tab J to JX 57. As I discuss later in this opinion, see note 44 and accompanying text, the contract with Coral contains all the same standard contract terms found in the NAESB form contract and provides for commercial terms similar to those in the other Disputed Contracts.

Account without prior notice to the counsel for First Lien Noteholders. Kelley Drye received a letter dated that same day from Covington & Burling, on behalf of Calpine, in response to an earlier request inquiring of Calpine's use of proceeds from the Rosetta Sale. That letter explained that Calpine would not provide the Noteholders with advance notice of Calpine's proposed uses for the Rosetta Proceeds but assured Kelley Drye that Calpine was using the Proceeds in accordance with the terms of the First Indenture. No details about the exact use were given.

In a letter sent one week later to BONY, Kelley Drye explained that Calpine's 10Q, dated on or about August 9, 2005, appeared to indicate Rosetta Proceeds had been permitted to be withdrawn from the Designated Asset Sale Proceeds Account. Accordingly, the First Lien Noteholders also requested copies of the Collateral Trustee's correspondence and documents pursuant to § 3.6 of the Collateral Trust Agreement. That section permits the Indenture Trustees and each First and Second Lien Noteholder to inspect and copy "any and all Security Documents ... notices, certificates, instructions or communications received by the Collateral Trustee in its capacity as such." [32]

On September 15, 2005, BONY forwarded the requested correspondence. The Indenture Trustees maintain that it was not until they received this documentation that they first knew that Calpine had used the Rosetta Proceeds to enter into the Disputed Contracts and obtain natural gas for short-term consumption as fuel. The next day, Kelley Drye notified BONY that review of the forwarded documents "make clear that withdrawals from such account exceeding $500 million have occurred since July of 2005, despite ... earlier requests. We reiterate our earlier demands that no further disbursements occur from the Designated Asset Sale Proceeds Account other than to pay the [First Lien] Notes." [33] The letter also noted that two proposed transfers were impermissible under the Instruments and that other conditions in the Instruments had not been met.[34]

Three days later, on September 19, BONY refused to release the funds for Calpine's two requested transfers, dated September 13 and September 16, from the Designated Asset Sale Proceeds Account. BONY notified Calpine of its decision invoking § 5.11(b) of the Collateral Trust Agreement, which instructs BONY to refrain from taking any action in the event of any disagreement between the parties to the agreement or to any of the other secured debt agreements resulting in "adverse claims being made in connection with Collateral held by the Collateral Trustee...."

On September 26, 2005, Calpine filed a complaint seeking declaratory and injunctive relief from the First Lien Trustee, the Wilmington Trust Company, and BONY. Calpine claims the purchases of natural gas using the Rosetta Proceeds are permissible under the Instruments because they constitute purchases of Designated Assets. The Indenture Trustees, representing the First and Second Lien Noteholders, disagree and contend that these

---

32. Under § 4.2 of the Collateral Trust Agreement, the Indenture Trustees are entitled to a copy of the Officer's Certificate and all other documents delivered to the Collateral Trustee with that Officer's Certificate and are "not obligated to take notice thereof or to act thereon...."

33. JX 61.

34. *Id. See* Collateral Trust Agreement § 4.1(b) (requiring written confirmation from the Credit Agreement Agent, Goldman Sachs Credit Partners).

contracts fall within the Exclusion to the definition of Designated Assets.

By early on in the lawsuit, Calpine had burned up in its power plants all the $313 million worth of the natural gas it purchased under the Disputed Contracts.

## II. *Legal Analysis*

A. *Calpine's Use Of The Rosetta Proceeds To Acquire Already–Extracted Natural Gas For Burning In Its Power Plants Did Not Involve The Purchase Of Designated Assets*

This is another in the genre of cases in which contending parties agree that contractual language is unambiguous but disagree about the meaning of that language. For its part, Calpine makes a very complex argument that is best illustrated by highlighting the more obvious textual argument Calpine explicitly eschews. The more obvious argument that Calpine does not advance is that the Exclusion only applies to purchases of an extant "contract"—that is, when Calpine buys a "contract" addressing the sale or purchase of natural gas and thereafter receives gas supplied under such a purchased contract. This would have been a plausible textual reading that would have been based on reading the definition of Designated Assets together with the relevant acts permitted by the Indentures—a purchase of replacement Designated Assets.

Thus, what Calpine might have argued was that it had the affirmative right to "purchase" (per § 4.10(d) of the each Indenture) ... "Designated Assets." To be clear, this reading depends on substituting grammatically the precise words of the Exclusion from the "what" that could be purchased (Designated Assets) and inserting the "excluded what" into its own negatively phrased sentence as a way of understanding the Exclusion's meaning. This negative sentence would read: Calpine may not "purchase ... contracts for the purchase or sale of natural gas and the natural gas supplied under such contracts."

In this way, the Exclusion could arguably be read as only prohibiting Calpine from purchasing "contracts for the purchase or sale of natural gas and the natural gas supplied under such contracts." Under this reading, the Exclusion would have acted as a carve-out when Calpine bought extant natural gas contracts as a form of commercial paper, but not when Calpine sat down from scratch and crafted a new contract involving the purchase or sale of natural gas. In other words, the phrase "and natural gas supplied under such contracts" only would have relevance when Calpine had in the first instance "purchased" an extant "contract for the purchase or sale of natural gas."

Calpine's problem with that reading is that it never wanted the Exclusion only to carve-out extant natural gas contracts that Calpine bought from other parties. Rather, it wished from the get-go to capture a situation when Calpine crafted a new contract whereby Calpine would buy natural gas for fuel over a delivery term involving receipt by Calpine in 30 to 60 days. In this situation, Calpine would clearly not be purchasing an extant contract but be acquiring by a contract, the rights to natural gas set forth in the new agreement it forged.

Feeling the corrosive effects of its own brine, Calpine has grasped at the hoary legal concept of title to lift itself out of the barrel. Conceding that the Exclusion generally covers the purchase of the rights to natural gas in new contracts for the purchase or sale of natural gas and natural gas supplied under such contracts, Calpine argues that the Exclusion embeds its own implicit exclusion for situations when the

contract vests immediate title to the natural gas in Calpine, irrespective of the other contract terms. That is, if Calpine buys natural gas by entering a contract under which it takes title to the natural gas straight away, Calpine says it is not acquiring a "contract for the purchase or sale of natural gas" or the "natural gas supplied under such [a] contract[ ]." Rather, because of the immediate transfer of title it is acquiring natural gas, which is a geothermal energy asset and thus a Designated Asset.

By contrast, the Indenture Trustees argue that the relevant Exclusion plainly applies not only to a situation when Calpine buys a contract for the sale or purchase of natural gas but when it enters into such a contract for the purpose of acquiring natural gas. Under ordinary principles of language usage, read in light of recognized principles of contract law, the natural gas Calpine is acquiring is, at the very least, natural gas supplied under a contract for the sale or purchase of natural gas. Indeed, each of the contracts Calpine entered expressly used the words a "contract for the purchase and sale of natural gas"—the common term used in the industry standard contract—and Cal-

pine was supplied natural gas under those contracts. For that reason, the Indenture Trustees say it is obvious that Calpine used the Rosetta Proceeds to purchase assets unequivocally excluded from the definition of Designated Assets.

■ Under New York law, I must resolve this dispute, if possible, by considering only the language of the relevant Instruments. If those Instruments are unambiguous, the court should interpret them as written and not consider parol evidence.[35] In determining whether the Instruments are unambiguous, I am entitled to consider the commercial context in which the Instruments were crafted and the common usage of words within that context.[36] Like reference to a dictionary, reference to standard industry usage is a permissible interpretive aid.[37] In the absence of any reason in the instruments themselves to conclude otherwise, the terms used in them should be interpreted in accordance with relevant industry custom.[38] With these concepts in mind, I will now resolve the interpretive dispute of the parties.

■ I begin with the commercial reality that there are costs and benefits to Cal-

---

**35.** See *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) (citing *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162–63, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)); Restatement (First) of Contracts § 235(a).

**36.** See *United States Underwriters Ins. Co. v. Falcon Contr. Corp.*, 2004 WL 1497563, at *6 (S.D.N.Y. July 1, 2004) ("Ambiguity determinations are ... made objectively, looking at the language from the view of a 'reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business'") (citing *Seneca Ins. Co. v. Kemper Ins. Co.*, 2004 WL 1145830, at *4 (S.D.N.Y. May 21, 2004)).

**37.** See N.Y.U.C.C. § 2–202; § 2–202 cmt. 1–2.

**38.** See *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 198, 36 N.E.2d 106 (Ct.App.1941); *Estate of Hatch by Ruzow v. NYCO Minerals*, 245 A.D.2d 746, 666 N.Y.S.2d 296, 298 (3d Dept 1997) *citing* 22 N.Y. Jur.2d Contracts § 242 ("[T]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate, and must be taken in the technical sense unless the context of the instrument or an applicable usage or the surrounding circumstances clearly indicate a different meaning."); Restatement (First) of Contracts § 235(b).

pine and the holders of the First and Second Lien Notes of a broad or narrow definition of the term Defined Assets in the Instruments. From Calpine's perspective when entering into the Instruments, a narrower definition of Designated Assets tended to give it more flexibility. Because the proceeds derived from selling Designated Assets could only be used for limited purposes, the broader the definition of Designated Assets the more Calpine was restricted in its ability to do business. By way of pertinent example, if the term Designated Assets covered the trading activities of CES, Calpine would have been restricted whenever it sold a futures contract at a profit meeting the $50 million threshold or sold natural gas it obtained by contract for an amount above that threshold.

Put simply, Calpine's current desire to read the exclusions from the term Designated Assets narrowly cannot obscure the reality that those exclusions serve in the ordinary flow of business to limit the contractual inhibitions on Calpine's use of its assets. The present dispute simply underscores that, as with most things in life, there was a corresponding cost to excluding categories from the term Designated Assets, which is triggered in the less common circumstance when Calpine sells Designated Assets as it did in the Rosetta Sale. At that point, what had been a benefit to Calpine—the exclusion of an asset type from the Designated Assets category—serves to limit its flexibility to deploy the resulting Rosetta Proceeds.

Calpine's method of doing business is also important context for interpreting the Instruments. By its plain terms, the core definition of Designated Assets includes proven natural gas reserves (i.e., natural gas in the ground and not yet extracted). Indeed, the exclusion for unproven reserves makes this even more obviously true. As Calpine points out, it regularly uses a small portion of its own natural gas reserves to supply some of its own needs for fuel at its power plants. But as the Indenture Trustees also note, the overwhelming majority of Calpine's fuel needs have been met through purchases of already-extracted natural gas from third-parties in the marketplace through contracts signed by CES using variations of the standard NAESB form. These contracts usually provide for the delivery of gas for use within a short period, such as a month. By contrast, Calpine's reserves tended to have a much longer life span of around ten years, and often increased in value despite extraction by Calpine for its own use.

The contractual language plainly picks up on the distinction between natural gas in the form of proven reserves and already-extracted natural gas purchased from third parties by contract. The term Designated Assets expressly includes proven reserves and expressly excludes already-extracted natural gas acquired by contract. This linguistic dividing line is clear and commercially sensible. By defining proven reserves as Designated Assets, the Instruments protected the Noteholders by limiting Calpine's flexibility to use the proceeds of the sale of key collateral for ordinary day-to-day purchases. Although Calpine retained the discretion to sell Designated Assets, it could only deploy the proceeds in a manner that was consistent with the Noteholders' interests; for example, by purchasing the First or Second Lien Notes or by purchasing replacement collateral in the form of new Designated Assets.

By contrast, the Exclusion of contracts for the sale or purchase of natural gas and natural gas supplied under such contracts permitted Calpine to conduct its day-to-day operations unimpeded by the Desig-

nated Assets restriction. This allowed the CES subsidiary to engage in (it is hoped) profitable energy futures trading without the restrictions imposed by the Designated Assets term. Likewise, and as important, it operated to exclude from the definition of Designated Assets the natural gas that CES acquired in the commodity markets for Calpine for use as fuel in its power plants, even if Calpine sold that gas to a third party for a profit. In sum, the Exclusion placed CES's trading activities entirely outside the definition of Designated Assets, permitting Calpine wide flexibility to sell and acquire extracted natural gas in the open market, with the goals of acquiring fuel as efficiently as possible for its own use and of generating trading profits.

Of course, Calpine now argues that this clear division has a subtle caveat. So long as Calpine acquires title to natural gas immediately upon contracting, Calpine argues that it is purchasing natural gas itself—a geothermal asset that is a Designated Asset—rather than a contract right to later acquire natural gas—which it admits would be excluded.

The problems with this argument are, to be understated, several. First, the Exclusion's plain words extend not only to "contracts for the sale or purchase of natural gas" but to "natural gas supplied under such contracts." Calpine seeks to read out the second part of the Exclusion by contending that it does not apply when it enters a contract whereby Calpine acquires title to natural gas immediately upon signing. In that circumstance, Cal-

pine argues that it is never supplied natural gas under a contract for the sale or purchase of natural gas because it takes title right away.

This argument finds no sustenance in the words of the Exclusion, governing contract law, or industry custom. The contracts Calpine entered to acquire natural gas with the Rosetta Proceeds are, by their own terms, contracts for the sale and purchase of natural gas. By virtue of those contracts, Calpine took title to natural gas, which was later supplied to it in accordance with the contracts' terms. That is, Calpine acquired natural gas supplied under a contract for the sale and purchase of natural gas. Such an acquisition is plainly excluded from the definition of Designated Assets.

In making its argument, Calpine places enormous weight on the fact that it crafted the Disputed Contracts in a manner that gave Calpine title to natural gas upon execution. But the concept of title will not bear this weight, notwithstanding the inexplicably wide swath that royalist fetishism now cuts through our republic's citizenry. Under New York's Uniform Commercial Code ("UCC"), the Disputed Contracts are contracts for the sale of goods.[39] New York's UCC, like that of most states and consistent with the intentions of the drafters of the Uniform Law Commission's proposed Uniform Commercial Code, places little emphasis on the question of when formal title passes under a contract for the sale of goods.[40] Under the New York

---

**39.** *See* N.Y.U.C.C. §§ 2–105(1), 2–107; *Apex Oil v. Belcher Co.,* 855 F.2d 997, 1002–1003 (2d Cir.1988); *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,* 92 N.Y.2d 458, 682 N.Y.S.2d 664, 670, 705 N.E.2d 656 (Ct. App.1998).

**40.** *See* N.Y.U.C.C. § 2–402 cmt. ("[T]his article deals with the issues between seller and buyer in terms of step by step performance

under the contract for sale and not in terms of whether or not title to the goods has passed."); *Outdoor Scenes, Inc. v. Anthony Grace & Sons, Inc.,* 111 Misc.2d 36, 443 N.Y.S.2d 583, 585. *Compare* N.Y.U.C.C. § 2–401: ("Each provision of this Article with regards to the rights, obligations and remedies of the seller, buyer, purchasers or other third parties applies irrespective of title to the

UCC, a "contract for sale" includes both a "present sale of goods and a contract to sell goods at a future time." [41] Likewise, Black's Law Dictionary defines a "purchase" as the "act or instance of buying" and a "sale" as the "transfer of property or title for a price." [42] Therefore, the fact that Calpine has chosen to use the Rosetta Proceeds to enter contracts for the sale and purchase of natural gas that convey title to Calpine immediately after the contract becomes effective is immaterial.

Critically, nothing in the language of the Instruments themselves refers to "title" or in any manner rationally supports the reading Calpine advances. As noted, Calpine specifically disclaims a reading that carves-out only "purchases" of already-extant "contracts." By doing so, Calpine admits that what is important is not that Calpine is buying a "contract" but the nature of the contract that Calpine chooses to buy or enter into with the proceeds from the sale of Designated Assets. If the contract that Calpine seeks to enter into is a "contract for the purchase or sale of natural gas," then *both* that contract and the "natural gas supplied under it" are outside the definition of Designated Assets and are not permitted investments. Here, the Disputed Contracts are by any measure contracts for the sale or purchase of natural gas and the natural gas Calpine ultimately receives is supplied under such contracts.

In this connection, the black-letter law also supports the natural division that the Instruments draw between proven reserves and contracts for already-extracted natural gas. While the Disputed Contracts clearly are contracts for the sale of goods under the U.C.C., contracts involving the purchase of natural gas in the ground (i.e., reserves) are treated by the U.C.C. as contracts for the sale of real property. [43] To buy substitute assets comparable to the Rosetta Assets, Calpine could not simply have entered into a variation of the NAESB form contract, it would have used a much more complex series of documents, reflecting that one is buying real property and not simply a commodity. In that respect, there is no doubt that Calpine did not use a simple variation on the NAESB form contract to consummate the Rosetta Sale.

This reading of the Exclusion not only comports with black-letter contract law, it is consistent with industry custom. Already-extracted natural gas is commonly sold using variations of the NAESB form contract, with the NAESB form supplying the standard terms. The Disputed Contracts all include the NAESB term "contract for the sale and purchase of natural gas," excepting one contract that, by its exceptionalism, actually illustrates the same point. That contract, involving a purchase of natural gas from Coral Energy Resources, L.P., used the form promulgated by the predecessor to NAESB, the

goods except where the provision refers to such title."), *and* Proposed Amendments to Uniform Commercial Code Article 2 Sales, National Conference of Commissioners of Uniform State Laws, 2002 (same). *See also Morrison v. Murray Biscuit Co.,* 797 F.2d 1430, 1436 (7th Cir.1986) ("Passage of title has lost its magic in commercial law.").

**41.** *See* N.Y.U.C.C. § 2–106(1); *Leveraged Leasing Adm. v. PacifiCorp Capital, Inc.,* 87 F.3d 44, 48 (2d Cir.1996); *Outdoor Scenes, Inc.,* 443 N.Y.S.2d at 585 (a contract for sale under

the UCC includes any contract which purports to pass title of goods).

**42.** Black's Law Dictionary, 8th ed. 2004.

**43.** *See* N.Y.U.C.C. § 9–102 cmt. 4(c) ("[O]il, gas, and other minerals that have not been extracted from the ground are treated as real property ... the definition of goods ... excludes oil, gas, and other minerals before extraction.").

Gas Industry Standards Board ("GISB"),[44] and incorporates definitions essentially identical to the NAESB form, including the phrase "contract for the sale and purchase of natural gas."

Given that CES has used the traditional NAESB form for its transactions in already-extracted natural gas, the prevalence of that form contract in the natural gas industry, and the absence of language in the Instruments suggesting that the drafters of the Exclusion meant to deviate from the typical meaning that would be given to the words "contract for the purchase or sale of natural gas," the most logical reading is to give the Exclusion's language its most obvious reading, as clearly covering sales and purchase contracts in already-extracted natural gas that are typically implemented using variations of the NAESB form contract.[45]

It is also telling that although Calpine went out of its way to restructure its purchases of natural gas in order to try to escape the clear language of the Exclusion, it did not do so in any way that made those contracts economically distinct from its prior purchase arrangements. It is, of course, true that in the past Calpine did not typically take title to natural gas upon contract signing, but that concept had little commercial importance. But Calpine commonly contractually obligated itself to purchase natural gas over short-term time periods in a manner that differs little from the Disputed Contracts in economic and legal substance. In the Disputed Contracts, Calpine did not require any inalienable right to a particular batch of natural gas at a specific price. Rather, Calpine typically acquired title to an amount of natural gas that was supposedly placed in storage at a particular facility, with the duty on its part to accept delivery of portions of that gas in accordance with a contractual schedule. The seller, however, retained the right to commingle Calpine's titled gas with other gas and to deliver to Calpine gas of a comparable kind from any source.[46] Moreover, if the seller did not deliver the full quantity of gas Calpine supposedly owned, the only liability the seller faced was to pay Calpine the cost of cover. Calpine cannot demand specific enforcement.

Consistent with this approach, the price that Calpine paid for gas initially typically was to be adjusted, upwards or downwards, based on the change in the spot market price from the time of the initial sales contract until delivery.[47] Although Calpine crafted parts of the sales agreement to govern storage obligations, no separate price was paid for storage for the obvious reason that as a matter of economic substance, the Disputed Contracts were essentially indistinct from an agreement to purchase a certain amount of gas per day at spot market prices over

44. The NAESB form contract has replaced the predecessor GISB standard form agreement for gas purchase and sale transactions.

45. *See supra* note 38. *See also Western Union Telegraph Co. v. American Comms. Assn.*, 299 N.Y. 177, 184, 86 N.E.2d 162 (1949) ("Where ... the language is unambiguous, the words plain and clear, conveying a distinct idea, there is no occasion to resort to other means of interpretation."). *See also New York v. St. Francis Hosp.*, 289 F.Supp.2d 378, 384 (S.D.N.Y.2003) ("Where, as here, the meaning of the agreement ... is unambiguous on its fact, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation.") (citing *New Bank of New England, N.A. v. Toronto–Dominion Bank*, 768 F.Supp. 1017, 1022 (S.D.N.Y.1991)).

46. *See* N.Y.U.C.C. § 1–201(17).

47. Posoli Dep. at 86.

a thirty-day period.[48] The simple legal and economic reality is that Calpine's rights to receive the gas it purchased, regardless of title, found its essence in contracts for the sale or purchase of natural gas. Those contracts required the seller "storing" Calpine's purchased natural gas to deliver it to Calpine for a price adjusted to day-of-delivery spot market prices. If the seller storing the gas did not do so, Calpine's only contractual remedy was the cost of cover.[49] Furthermore, Calpine's weak attempt to argue that the storage agreements are separable from the original contract by which Calpine took title is unavailing. By their plain terms, the sales and storage promises of Calpine and its seller are interrelated and constitute what the Disputed Contracts themselves refer to as a "single, integrated agreement."[50]

### B. *The Parol Evidence Does Not Support Calpine's Reading of the Exclusion*

Although I do not believe that the Exclusion is ambiguous, I will, in the interest of providing a full record for review, note that none of the proffered parol evidence alters my conclusion that Calpine's interpretation of the Exclusion is erroneous.

At trial, Calpine presented evidence to show that the Exclusion was proposed by it in an attempt to secure maximum flexibility for itself. This testimony, however, fell far short of convincing me that the Exclusion means what Calpine now says it means.

For one thing, Calpine presented no testimony regarding the actual scrivening of the Exclusion. Rather, it presented testimony by Calpine's CFO, Kelly, that he sought "maximum flexibility" in the negotiations over the Designated Assets definition.[51] Kelly—who never read the Exclusion!—testified that he sought to exclude unproven reserves from the definition of Designated Assets because Calpine got no credit in the pricing of its notes for such unproven reserves and therefore should not face restrictions in acquiring or disposing of them.[52]

Likewise, Kelly sought to exclude from the reach of the definition of Designated Assets the activities of CES. Kelly's testimony was echoed by Bennett, a lawyer who led the negotiations on behalf of Calpine over the Instruments. He recalls the Exclusion being added to carve-out CES. Notably, Bennett could not shed light on the actual drafting of the Exclusion or any discussions of it with Latham & Watkins, counsel for the initial purchasers of the Second Lien Notes, Goldman Sachs.

On balance, I actually find Kelly's and Bennett's testimony more supportive of the Indenture Trustees' reading of the Exclusion than of Calpine's. When Calpine was bargaining for the Exclusion, its objective was to shrink the Designated Assets definition as much as possible. By

---

**48.** The titling of gas in Calpine's name might have some consequences in a situation when a seller went bankrupt, by giving Calpine the right to claim that the seller was now only a bailee, holding Calpine's property in storage. *See Interchange Bank v. Warde Elec. Contracting, Inc.*, 308 B.R. 659, 664 (Bankr.S.D.N.Y. 2004) (citing to 11 U.S.C. § 541(a)(1)). But, even assuming this advantage, which the Indenture Trustees dispute with plausible arguments, the obvious reason that Calpine took title was not to gain this hypothetical advantage to address a low-probability scenario, but solely to support its contractual argument. *See* Kelly Dep. at 72–73; Roberts Dep. at 119; Oral Argu. Tr. at 183–184.

**49.** *E.g.*, JX 29 at CPN 00000417.

**50.** Ex. J to JX 57 at WTC 335.

**51.** *See supra* note 11.

**52.** Kelly Dep. at 61.

doing so, it obtained more flexibility to run its business. Notably, the Exclusion enabled the unit that Calpine used to acquire natural gas for its own use and for trading profits (by resale) to do so free of the restraints on the use of proceeds from the sale of Designated Assets.

The idea that the Exclusion did not pertain when Calpine took "title" to natural gas was not one Calpine subjectively held at the time of contracting, nor was it one that Calpine shared with its negotiating adversary. Rather, Calpine sought the Exclusion on the basis that its purchases of already-extracted natural gas in the commodity markets for trading and fuel acquisition purposes were categorically different and should be outside the definition of Designated Assets. That rationale was not hinged on whether Calpine was acquiring already-extracted natural gas for fuel by a short-term contract in which it took immediate title (with deliveries over the next 30 to 60 days) rather than taking title when deliveries were made (over the same 30 to 60 day period).

Imagine if Calpine had explicitly told Goldman Sachs, as initial purchasers of the Second Lien Notes, that its position was that CES was off limits when that benefited Calpine, but that Calpine could sell all of its Designated Assets and use them to purchase hundreds of millions of dollars in fuel for short-term consumption so long as the contract immediately vested "title" to the gas in Calpine. If that had occurred, I am highly confident—to borrow a phrase Goldman Sachs would find familiar—that Calpine would not have obtained consent to that flexibility at the bargaining table. In this same connection, it is notable that neither the offering documents for the First and Second Lien Notes, nor the disclosures issued in connection with the Qualified Offer, ever surfaced such a possible use of proceeds from the sale of Designated Assets.[53] Why? Because the "exclusion from the Exclusion" Calpine now contends existed from the get-go was not conceived when the Instruments were drafted but only in 2005 after the Qualified Offer had such disappointing results.

Given the negotiating context, the dividing line the plain language of the Instruments draws becomes even more logical. Designated Assets generally referred to long-lived assets that would retain value over time. Although these assets could shrink—in value through life span or a draw down of reserves—sales of them above $50 million would usually require a major transaction. When that occurred, the Instruments required that Calpine would either buy comparable replacement collateral—other Designated Assets—or use the proceeds to reduce the obligations (First or Second Lien Debt) collateralized by the Designated Assets.

By contrast, Calpine secured the flexibility to sell unproven reserves or to deal in already-extracted natural gas in the ordinary course of business without restriction from the definition of Designated Assets. If Calpine could profit by selling extracted natural gas it purchased—regardless of amount—it was free to use those proceeds without restriction from the Designated Assets definition. In other words, by the Exclusion, Calpine obtained a rational carve-out enabling it to conduct its ordinary, but important, commercial purchases and sales of natural gas entirely outside the restrictions on Designated Assets. It is only now, when an unusual and unforeseen opportunity presented itself, that Calpine was inspired to invent its current "title"-based distinction.

**53.** JX 13, 14, 62.

Lastly, to the extent that evidence of industry custom and usage can be purely parol, that evidence weighs heavily against Calpine. The Indenture Trustees' expert, John Reed, provided entirely convincing testimony that the standard usage of the term "contracts for the purchase or sale of natural gas" applies to contracts using the NAESB form [54] (or its GISB predecessor) as a foundation that have the following attributes: (i) a quantity of gas to be bought and sold pursuant to the agreement; (ii) a price for the commodity; (iii) location of gas delivery; and (iv) a term of duration for obligations of the parties to sell/purchase.[55]

Reed correctly observed that the Disputed Contracts all have those attributes. He also accurately observed that the restructuring of the Disputed Contracts to vest formal title in Calpine immediately upon contracting does not, by industry usage, render them categorically different from the NAESB "Base Contract for Sale and Purchase of Natural Gas," which Calpine, via CES, routinely used to purchase natural gas for use as fuel. Indeed, he notes that each of the Disputed Contracts uses words virtually identical to those to describe itself [56] and that the annexed "storage" contracts were not, in any material sense, distinct, but rather operated as an integrated agreement.[57] Although Reed admitted that the titling aspect might have some minor legal effect on the rights of Calpine, he persuasively showed that this difference did not make the Disputed Contracts, as a matter of economic reality or industry custom, distinct from the contracts Calpine, through CES, had historically used to acquire natural gas for fuel. In short, the parol evidence on industry customs convincingly showed that

the language of the Exclusion would, by industry parlance, encompass the Disputed Contracts because they were "contract[s] for the purchase or sale of natural gas."

This expert testimony also shed light on why the Exclusion used the words it did. By using standard industry language drawing on the NAESB form contract, the scriveners embodied in the Exclusion the broad range of variations of contracts for purchase and sale used by participants in the already-extracted natural gas commodity markets. These were precisely the types of contracts that CES used to sell and purchase already-extracted natural gas, including gas for Calpine's own fuel needs. Thus, by using industry terminology, Calpine extracted the broad Exclusion it wanted. Now, it must live with the downside of having done so.

III. *Remedy For Calpine's Improper Use And Proposed Use Of The Rosetta Proceeds*

Having determined that Calpine (i) could not permissibly enter into the Disputed Contracts and (ii) may not enter into new contracts of a similar nature using the Rosetta Proceeds, I must now address the question of what to do about those conclusions. As to the second determination, the answer is easy and a declaration that Calpine cannot enter into future contracts for natural gas using the Rosetta Proceeds will suffice, as the Collateral Trustee will refuse to release the Proceeds for that purpose, given my ruling.

The stickier question is what remedy should issue as to Calpine's use of $313 million of the Rosetta Proceeds to enter into the Disputed Contracts. This ques-

54. Tr. at 266.

55. JX 81 at 5.

56. Tr. at 266–67, 290.

57. JX 81 at 9.

tion is difficult because only the First Lien Trustee filed timely claims seeking relief on this score. The First Lien Trustee premised its request for relief on a variety of grounds, including the core ground of breach of contract, and duplicative belts and suspenders arguments such as unjust enrichment of Calpine and wrongful conversion of assets belonging to the holders of the First Lien Notes. In essence, the First Lien Trustee argues that Calpine should restore the $313 million plus appropriate interest to the Designated Asset Sale Proceeds Account and require that those funds be used in accordance with the relevant Instruments.

For its part, the Second Lien Indenture Trustee now wishes similar relief. But it waited until Calpine had already filed its opening pre-trial brief and after discovery had already closed to file its own counterclaims demanding that relief. By that time, trial was a mere two days ahead.

Calpine addresses the arguments of the two Indenture Trustees very differently. Calpine argues that the First Indenture Trustee's claim for restoration of the $313 million must be denied because the First Indenture Trustee lacks standing. According to Calpine, once it made its tender offer to the First Lien Noteholders, it owed no further obligation to the First Lien Noteholders as to the use of the Rosetta Proceeds other than to avoid spending the funds on any use that was not "otherwise prohibited by the [First Lien] Indenture." [58] Because the First Lien Indenture does not otherwise prohibit Calpine from acquiring natural gas with Designated Assets once Calpine discharges its obligation to make a Qualified Offer for the First Lien Notes under § 4.10(d) of the First Lien Indenture, Calpine argues that the First Lien Trustee has no standing to argue for relief regarding Calpine's

misuse of the $313 million. As to the Second Lien Trustee, Calpine argues that its tardy request for relief requires deferral of its request for restorative relief. I deal with each of these arguments in turn.

### A. The First Lien Trustee Lacks Standing To Request A Remedy

The First Lien Trustee justifies its standing through two separate arguments. The first is that Calpine's Qualified Offer in July 2005 did not discharge its obligation to make a Qualified Offer to the First Lien Noteholders with any Rosetta Proceeds not used to buy Designated Assets. In this connection, the First Lien Trustee argues that § 4.10(d) of the Indenture prevents Calpine from commencing a Qualified Offer before it has actually received Excess Proceeds from a sale of Designated Assets. Because Calpine launched the Qualified Offer for First Lien Notes before the Rosetta Proceeds were actually received, the First Lien Trustee says the Qualified Offer does not discharge Calpine's duty under § 4.10(d).

But this argument is not borne out by § 4.10(d) itself. Under the terms of that section in the First Lien Indenture, Calpine may make an offer to all holders of the priority notes when the "aggregate amount of Excess Proceeds exceeds $50.0 million" or "at such earlier point as may be elected by the Company." When Calpine made its Qualified Offer on June 9, 2005, it clearly conditioned the Offer on the consummation of the Rosetta Sale and made clear that it would be paying the First Lien Noteholders with the proceeds from a sale of Designated Assets. There is no dispute that Calpine offered the First Lien Noteholders the price required by

---

**58.** First Lien Indenture § 4.10(d).

§ 4.10(d), a full repayment of principal plus all accrued interest.

In essence, Calpine forewent its right under § 4.10(c) of the First Lien Indenture to take 180 days to purchase Designated Assets with Excess Proceeds before having to make a Qualified Offer. It instead chose to make a Qualified Offer that would close at the earliest practicable time after it actually received the Excess Proceeds. I perceive no possible offense to the contractual rights of the First Lien Noteholders by this course of action. By the terms of the First Lien Indenture, once Calpine made a Qualified Offer to the First Lien Noteholders, the Excess Proceeds were "reset at zero" and Calpine could use any remaining funds for any purpose "not otherwise prohibited by this [First Lien] Indenture." [59]

This inconvenient reality is what prompts Calpine's argument that the First Lien Trustee has no standing to complain about what Calpine did with the Rosetta Proceeds after the Qualified Offer closed. Because no provision of the First Lien Indenture otherwise prohibits Excess Proceeds remaining after a Qualified Offer from being used to purchase natural gas, Calpine contends that the First Lien Trustee has no cognizable right to contest that usage.

This argument of Calpine's is what inspires the First Lien Trustee's second basis for asserting that it has standing. That argument consists of the proposition that the First Lien Noteholders have an enforceable interest in assuring that Calpine honors *all* the provisions of the Control Agreement, including the referenced obligations under the Second Lien Indenture. Although the Control Agreement and Collateral Trust Agreement were entered into before the First Indenture was executed,

the First Lien Trustee argues that a provision of the Control Agreement, § 2.01(c), trumps the use of the Excess Proceeds under the First Lien Indenture. Not only that, but by the express terms of the Collateral Trust Agreement, which the First Lien Trustee became a party to through the Joinder Agreement executed concurrently with the First Lien Indenture, the First Lien Noteholders are deemed third-party beneficiaries of the Collateral Trust Agreement and Control Agreement.

Therefore, the First Lien Trustee claims that it has standing to ensure that Calpine only uses the Excess Proceeds in a manner consistent with the requirements of all the Instruments, including the Second Lien Indenture, even after Calpine has discharged its obligations to the First Lien Noteholders, by making a Qualified Offer under § 4.10(d) of the First Lien Indenture. Because the Control Agreement and Joinder Agreement operate to harmonize the First and Second Lien Indentures, and because the First Lien Noteholders are benefited incidentally by the provisions in those Agreements relating to the Second Lien Noteholders, the First Lien Trustee has the right to complain if Calpine does not follow all the terms—including those pertaining solely to the Second Lien Noteholders. As a practical matter, this means that the First Lien Trustee is seeking to enforce the restrictions of the Second Lien Indenture.

That Indenture, when read consistently with the First Lien Indenture under the Collateral Trust and Collateral Joinder Agreements, operates to restrict Calpine to three uses of the remaining Rosetta Proceeds. Until 180 days from the receipt of the Rosetta Proceeds, on or about January 3, 2006, the Second Lien Indenture permits Calpine to acquire First Lien

59. *Id.*

Notes (which qualify as "Priority Lien Debt" under the Second Lien Indenture) or Designated Assets. At the end of that period, Calpine must make a Qualified Offer to the Second Lien Noteholders under § 4.10(d) of the Second Lien Indenture.

For obvious reasons, the First Lien Trustee would like to enforce this requirement now. By requiring Calpine to replenish the Excess Proceeds pool by $313 million, the amount of gas purchased under the executed Disputed Contracts, the First Lien Trustee maximizes the possibility that Calpine will make another Qualified Offer to the First Lien Noteholders or market purchases of First Lien Notes.

The problem for the First Lien Trustee is that this understandable desire does little to show that the First Lien Noteholders have a legally cognizable right to demand that end. In other words, any benefit to the First Lien Noteholders of the provisions of the Second Lien Indenture restricting the use of Designated Assets is wholly incidental and not intended. By its plain terms, the First Lien Indenture allows Calpine to use any remaining Rosetta Proceeds for "any purpose not otherwise prohibited by this [First Lien] Indenture" once it has made a Qualified Offer under § 4.10(d) of the First Lien Indenture. And, contrary to the First Lien Trustee's reading, the Control Agreement makes clear that it and the Collateral Trust Agreement are instrumental agreements that work to protect the substantive rights granted by the Indentures. Thus, the text of § 2.01(c)(i)(A) does not support the First Lien Trustee's argument that § 2.01(c) trumps the use of Excess Proceeds under the First Lien Indenture. Section 2.01(c)(i)(A) recognizes that Priority Debt (in this case, the First Lien Notes) issued in the future may include protections in instruments, namely the First Lien Indenture, which can not be anticipated by the Control Agreement, which was executed before the issuance of any Priority Debt. Thus, § 2.01(c)(i)(A), in relevant part, provides:

> [A] specified amount of the funds on deposit in the Designated Asset Sale Proceeds Account (x) will be used ... to (1) purchase other assets that would constitute Designated Assets or (2) repay Priority Lien Debt ... in each case *in accordance with the applicable provisions of each Secured Debt Document* ... (emphasis added).[60]

The proper parties who are the intended beneficiaries of the restriction on Calpine's use of the Remaining Rosetta Proceeds are the Second Lien Noteholders. They secured the right to require Calpine, once it has satisfied its obligations under the First Lien Indenture, only to use remaining Excess Proceeds to buy Designated Assets, repurchase First Lien Notes, and, if those purposes did not use up the Proceeds, to make a Qualified Offer to the

---

**60.** Similarly, the First Lien Trustee relies mistakenly on § 3.02(a) and § 5.02 of the Control Agreement to support its position that they have standing to request a remedy even after Calpine has fulfilled the obligations under § 4.10(d) of the First Lien Indenture. The plain meaning of those provisions offers no textual support for the First Lien Trustee's position. The first sentence of § 3.02(a), the only relevant part of that provision related to the dispute before the court, merely references the terms and conditions of the Control Agreement. Section 5.02, in language highlighted by the First Lien Trustee, reads "each such covenant and provision [of the Control Agreement] being for the sole benefit of the parties hereto...." But, there is nothing in the text in either provision that suggests that the First Lien Trustee continues to have an interest as a third-party beneficiary in the use of proceeds from the sale of Designated Assets once the First Lien Indenture's requirements are fulfilled.

Second Lien Noteholders. For that reason, I conclude that Calpine is correct that the First Lien Trustee has no right to demand restoration of the $313 million or other similar relief.

## B. *The Second Lien Trustee's Tardiness Warrants Deferral of the Restorative Remedy Determination*

The dilemma the First Lien Trustee's lack of standing creates is unfortunate. Because the First and Second Lien Indenture Trustees have pursued identical objectives, it seems a tad silly to refuse to address the appropriate relief simply because the Second Lien Trustee did not timely file its counterclaims seeking restoration of the $313 million. That said, the shape of the precise relief that should be awarded is a delicate matter with important implications for Calpine and all of its constituencies. Therefore, I consider it prudent to defer the question of remedy until Calpine has answered the Second Lien Trustee's counterclaims (which it shall do by November 28, 2005), conferred with the Second Lien Trustee, and, in the absence of agreement as to remedy, presented expedited submissions of 15 pages addressing the form of relief by November 30, 2005, and five-page replies the next day, December 1. But, lest there be any confusion, some form of relief requiring the restoration of $313 million plus some modest interest is almost surely in order with the primary question being when restoration has to occur and what temporal flexibility Calpine will have to devote those restored proceeds to the purchase of proper Designated Assets or First Lien Notes, as opposed to a Qualified Offer under § 4.10(d) of the Second Lien Indenture. The torpor of the Second Lien Trustee in filing the counterclaims will be taken into account in that remedial calculus.

## IV. *Indemnification Rights*

■ The First Lien Trustee has sought a declaration that it is entitled to indemnification for its reasonable expenses in litigating this matter. Calpine sued the First Lien Trustee and asked it to respond to its contentions that its use of the $313 million to enter into the Disputed Contracts and its desire to use the remainder of the Rosetta Proceeds to enter into contracts of an identical nature was proper. Therefore, the First Lien Trustee is entitled to indemnification from Calpine under § 7.07 of the First Lien Indenture. In its papers, Calpine argues that the First Lien Trustee's request is premature as it has not received a formal, documented request outside of the litigation process. Although the First Lien Indenture § 7.07 does require prompt notice to Calpine of any request for indemnification, it does not specify the form. The First Lien Trustee has obviously given such notice by its claim.

I cannot decide the amount of indemnification to which the First Lien Trustee is entitled but simply note its entitlement. Moreover, although I have found the First Lien Trustee had no standing to raise its affirmative requests for relief, any attempt by Calpine to try to diminish that entitlement will be met with little patience by me, given the obvious relationship between those requests and the issues that Calpine presented in its request for declaratory relief, and the reality that Calpine benefited by having the First Lien Trustee take the lead on issues of joint interest to the First and Second Lien Trustees. Absent that cooperation, Calpine would simply have had to indemnify the Second Lien Trustee to a greater extent under § 7.07 of the Second Lien Indenture. In the scheme of things, this is an issue of modest importance that rational persons of business and law ought to be able to work out

on their own with no need for further judicial intervention.

## V. *Conclusion*

■ For the foregoing reasons, (i) Calpine's use of the Rosetta Proceeds to enter into the Disputed Contracts violated the Second Lien Indenture and use of the Rosetta Proceeds for similar contracts is impermissible; (ii) the question of the appropriate remedy for the Disputed Contracts is deferred briefly; and (iii) Calpine shall indemnify the Indenture Trustees for their reasonable expenses upon submission of proper documentation. BONY's motion to dismiss is also denied.[61] The parties shall submit a conforming order by November 30, 2005. In that regard, the parties shall recognize that I intend to enter a complete final judgment promptly even if no agreement on remedy can be forged. That will facilitate efficiency by avoiding a piecemeal appeal.

**61.** BONY has argued that Goldman Sachs Credit Partners ("GSCP"), as a party to the Collateral Trust Agreement, is an indispensable party. This dispute deals with the only parties that have obstructed the release of the Rosetta Proceeds—the Indenture Trustees. Besides the Indenture Trustees, GSCP is the only other relevant party to the Collateral Trust Agreement and GSCP has been notified of this action and did not seek to intervene, most likely because its interests were fully, if incidentally, advocated by the Indenture Trustees. As already discussed, under § 5.11(b) of the Collateral Trust Agreement, BONY is permitted to refrain from releasing funds from the Designated Asset Sale Proceeds Account in the event of disagreement between the parties and until that disagreement is resolved by the parties or by a court order. With the issuance of this opinion, BONY now has a declaratory judgment that provides it with clear direction, a court order to satisfy § 5.11(b), and that binds Calpine and the parties who actually disagreed. Thus, from a liability perspective, BONY is in a more secure place than when it released the $313 million, which it did without having any idea of GSCP's position. Even if I had ruled for Calpine in this decision, BONY's motion would still have been without force. Through a ruling for Calpine, I would have resolved the only disagreement between parties to the Collateral Trust that existed and declaratory relief could have been limited to address only the parties before the court. Should BONY have somehow continued to fear that the releases proposed by Calpine would have been risky due to GSCP's silence, practical resolutions for BONY would have existed. Most notably, BONY could have managed potential liability by giving GSCP notice that unless GSCP objected within some period of time, it would release the Rosetta Proceeds. In all events, no ruling in this case will prejudice GSCP. For these reasons, BONY's motion to dismiss is denied.