# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MUDRICK CAPITAL )
MANAGEMENT L.P., ET AL., )
)
Plaintiffs, )
)
v. ) C.A. No. 2024-0106-LWW
)
QUARTERNORTH ENERGY INC., )
ET AL., )
)
Defendants. )

## MEMORANDUM OPINION

Date Submitted: February 19, 2024
Date Decided: February 26, 2024

Bradley R. Aronstam, Roger S. Stronach & Benjamin M. Whitney, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Jordan A. Goldstein, Lauren J. Zimmerman & Babak Ghafarzade, SELENDY GAY PLLC, New York, New York; *Counsel for the Plaintiffs*

Blake Rohrbacher, Matthew W. Murphy, John M. O'Toole, Edmond S. Kim, Spencer V. Crawford & Margaret Rockey, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Harry P. Susman, SUSMAN GODFREY L.L.P., Houston, Texas; *Counsel for Defendants QuarterNorth Energy, Inc., Avenue Energy Opportunities Fund II, L.P., the Franklin Defendants, and the Nuveen Defendants*

Thomas W. Briggs, Jr. & Kirk Andersen, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Andrew K. Glenn, GLENN AGRE BERGMAN & FUENTES LLP, New York, New York; *Counsel for the Invesco Defendants*

**WILL, Vice Chancellor**

In a few days, QuarterNorth Energy, Inc. is set to close on a $1.6 billion merger with Talos Energy Inc. QuarterNorth's stockholders will receive consideration of cash and Talos shares. The deal is—by all accounts—favorable for QuarterNorth and its investors.

The plaintiffs, who are minority securityholders in QuarterNorth Energy, Inc., support the Talos merger. But they believe that the defendant majority investors are improperly invoking drag-along rights in conjunction with it. In this action, the plaintiffs allege that the Talos merger agreement is inconsistent with the terms of a drag-along provision in QuarterNorth's stockholders agreement. They also assert that the drag-along provision does not apply to the plaintiffs who own only warrants.

The plaintiffs are not reasonably likely to succeed on these claims. The merger agreement and drag-along sale notice appear consistent with the terms of the stockholders agreement. It would also be unreasonable for the drag-along provision to only apply to the narrow subset of investors that the plaintiffs insist are implicated.

The plaintiffs will, now or later, receive the merger consideration. They prefer for their warrants to roll through post-closing so that they can decide when to exercise them for cash and Talos shares. But money damages are an available (albeit tricky) remedy if I later find they were improperly subjected to the drag-along sale.

Further, the balance of the equities disfavors the plaintiffs. To enjoin the drag-along sale could put the Talos merger at risk, harming all QuarterNorth investors.

1

Preliminary injunctive relief is therefore unavailable. The plaintiffs may pursue relief after the merger closes.

## I. FACTUAL BACKGROUND

The background is drawn from the allegations in and exhibits to the Verified Complaint (the "Complaint"), and affidavits and documents submitted by the parties in connection with the plaintiffs' motion for a preliminary injunction.

### A. The Formation of QuarterNorth

QuarterNorth Energy Inc. (the "Company") is a private corporation that holds oil and gas leases and owns and operates production facilities in the Gulf of Mexico.[1] It was formed on August 27, 2021 as part of a Chapter 11 reorganization plan for its predecessor oil and gas production company, Fieldwood Energy LLC.[2] As part of the reorganization, Fieldwood sold certain deepwater assets to QuarterNorth.[3]

In exchange for these assets, QuarterNorth issued shares of Company common stock ("Common Stock") and subscription rights to Fieldwood's first-lien lenders and issued two tranches of warrants ("Warrants") and subscription rights to Fieldwood's second-lien lenders.[4] Fieldwood's first-lien lenders include defendant Avenue Energy Opportunities Fund II, L.P. and the groups of defendant funds

---

[1] Verified Compl. (Dkt. 1) ("Compl.") ¶¶ 34, 36.

[2] *Id.* ¶ 34.

[3] *Id.* ¶ 35.

[4] *Id.*

referred to in the Complaint as the "Franklin Stockholder Defendants," "Invesco Stockholder Defendants," and "Nuveen Stockholder Defendants" (together, the "Drag-Along Defendants").[5] Fieldwood's second-lien lenders include the plaintiffs and some of the Drag-Along Defendants.[6] The Warrants received by the second-lien lenders have more than five years remaining before they expire.

## B. The Warrant Agreements and Stockholder Agreement

To govern the issuances of Common Stock and Warrants, QuarterNorth entered into several agreements dated as of August 27, 2021. It executed two materially identical Warrant Agreements.[7] It also executed a Stockholders Agreement, which is binding on Warrant holders "even if not a signatory thereto."[8]

The Warrant Agreements explain that each Warrant entitles the holder "to purchase from the Company . . . , upon proper exercise and payment of the Exercise Price in cash, a number of Warrant Shares equal to the then-applicable Warrant

---

[5] *Id.*; *see id.* ¶¶ 22-24.

[6] *Id.* ¶ 35; *see id.* ¶¶ 17-19; Pls.' Opening Br. in Support of Their Mot. for a Prelim. Inj. (Dkt. 24) ("Pls.' Opening Br.") 3 n.3.

[7] *See* Compl. Exs. A-B (together, "Warrant Agreements").

[8] Compl. Ex. C ("Stockholders Agreement") 1.

Share Number."[9] They also confirm that each Warrant is subject to "the provisions of th[e] [Warrant Agreements] and the Stockholders Agreement."[10]

The Warrant Agreements address the treatment of Warrants in the event of a merger. Section 7(a) of the Warrant Agreements contemplates that the Warrants would "roll through" after closing:

> If a Reorganization occurs at any time on or prior to the Expiration Date (or, if later, the settlement date for any exercise of Warrants), then, following the effective time of such Reorganization, a Holder's right to receive Warrant Shares upon exercise of its Warrants shall be converted into the right to receive upon exercise, with respect to each Warrant Share that would have otherwise been deliverable hereunder, one Unit of Reference Property . . . .[11]

In Section 7(b), QuarterNorth agreed to preserve appliable Warrant holders' rights if it entered into a merger:

> The Company shall not consummate any Reorganization unless the Company first shall have made appropriate provision to ensure that the applicable provisions of [the Warrant Agreements] shall immediately after giving effect to such Reorganization be assumed by and binding

---

[9] Warrant Agreements § 5(c). The "Warrant Shares" are the shares of Common Stock "deliverable upon proper exercise of the Warrants." *Id.* § 3(a). The "Warrant Share Number" is the number of shares of Common Stock received from the Company "upon proper exercise and payment of the Exercise Price." *Id.* The "Exercise Price" is $166.09 per Warrant Share. *Id.* § 5(b).

[10] *Id.* § 3(c).

[11] *Id.* § 7(a). "Reorganization" includes "any consolidation, merger, statutory share exchange, business combination or similar transaction with a third party . . . in which the Common Stock is converted into, is exchanged for or becomes the right to receive cash, other securities or other property." *Id.* § 1. "Unit of Reference Property" means "in respect of any Reorganization, the kind and amount of Reference Property that a holder of one Share (or the holder of one Unit of Reference Property in respect of a prior Reorganization, as applicable) is entitled to receive upon the consummation of such Reorganization." *Id.*

on the other party to the Reorganization (or the surviving entity, successor, parent company and/or issuer of such Reference Property, as appropriate) and applicable to any Reference Property deliverable upon the exercise of Warrants . . . .[12]

The Stockholders Agreement contains a drag-along mechanism, which allows the "Drag-Along Sellers" (defined as "holders of Common Stock and [] Warrants" that own 50% or more of the Company's Common Stock) to cause the remaining "Other Stockholders" (defined as "each other holder of Common Stock and [] Warrants") to join in certain transactions.[13]  It applies to any "Transfer" of Common Stock, including a "sale of equity interests, merger or sale of all or substantially all assets"—referred to as a "Drag-Along Sale."[14]  Section 3.03(a) of the Stockholders Agreement (the "Drag-Along Provision") details the triggering and application of these drag-along rights:

> If holders of Common Stock and [] Warrants (the "Drag-Along Sellers") owning 50% or more of the Aggregate Common Stock propose to Transfer shares of Common Stock held by them constituting at least 50% of the Aggregate Common Stock, including through a sale of equity interests, merger or sale of all or substantially all assets of the Corporation (a "Drag-Along Sale"), the Drag-Along Sellers may at their option (the "Drag-Along Rights") require each other holder of Common Stock and [] Warrants (the "Other Stockholders") to:
>
> (i) sell a number of shares of the Common Stock and [] Warrants owned by such Other Stockholder equal to the Drag-Along Portion of

---

[12] *Id.* § 7(b).

[13] *See* Stockholders Agreement § 3.03(a)(i).  The "Emergence Warrants" are the Warrants issued by QuarterNorth.  *See supra* note 4 and accompanying text.

[14] *Id.* § 3.03(a).

such Other Stockholder to the Person to whom the Drag-Along Sellers propose to sell their shares of Common Stock and/or [] Warrants (the "Drag-Along Buyer") and on the same terms and conditions as the Drag-Along Sellers (*provided* that in the case of the [] Warrants, if the Drag-Along Sellers do not require the exercise of [] Warrants pursuant to Section 3.03(a)(iv), the consideration to be paid to the Other Stockholders in respect of [] Warrants will be the amount that would have been payable had the [] Warrants been exercised prior to the Drag-Along Sale and sold as Common Stock minus the aggregate exercise price payable for the exercise of the [] Warrants . . . );

(ii) if such Drag-Along Sale requires Stockholder approval, . . . vote . . . all shares of Common Stock in favor of, and adopt, such Drag-Along Sale . . . ;

(iii) subject to Section 3.03(d)(ii), execute and deliver all related documentation and take such other action in support of the Drag-Along Sale as shall reasonably be requested by the Corporation or the Drag-Along Sellers . . . ;

(iv) exercise any [] Warrants held by the Other Stockholders (to the extent exercisable) immediately prior to the consummation of the Drag-Along Sale and in such case the shares of Common Stock issued on conversion will be delivered in lieu of the [] Warrants . . . ;

(v) not deposit, and to cause their Related Persons not to deposit . . . any shares of Common Stock or [] Warrants owned by such Other Stockholder in a voting trust . . . ; and

(vi) waive, and refrain from exercising, any dissenters' rights or rights of appraisal under applicable Law at any time with respect to such Drag-Along Sale.[15]

---

[15] *Id.* § 3.03(a)(i)-(vi).

## C.    The Talos Merger

On January 15, 2024, QuarterNorth announced a merger agreement with Talos Energy Inc. (the "Merger Agreement") through which Talos is to acquire QuarterNorth for $1.6 billion.[16]  A wholly owned subsidiary of Talos is to merge into QuarterNorth, with QuarterNorth surviving as an indirect wholly owned subsidiary of Talos.[17]  As consideration, QuarterNorth common stockholders are to receive a combination of cash and Talos stock.[18]  Section 2.04 of the Merger Agreement explains that each Warrant will be converted into the right to receive the same merger consideration payable for Common Shares.[19]  The proposed deal represents a significant increase to QuarterNorth's market valuation on a per share basis.[20]

On January 19, QuarterNorth issued a notice informing the Other Stockholders (the "Drag-Along Sale Notice") that the Drag-Along Defendants were exercising their drag-along rights "[p]ursuant to Section 3.03 of the Stockholders Agreement."[21]  It explained that each Other Stockholder would be required to

---

[16] Compl. ¶ 56; Compl. Ex. E at 3; *see* Compl. Ex. D ("Merger Agreement").

[17] Compl. ¶¶ 7, 57; *see* Merger Agreement Item 1.01.

[18] Compl. ¶ 58; *see* Merger Agreement Item 1.01.

[19] Merger Agreement § 2.04.

[20] Compl. ¶ 60.

[21] Compl. Ex. F ("Drag-Along Sale Notice") 1; *see* Compl. ¶ 63.

"transfer all of the shares of Common Stock and [] Warrants owned by such Other Stockholder in the Drag-Along Sale on the same terms and conditions as the Drag-Along Sellers."[22]

On January 30, QuarterNorth announced that a stockholder vote on the merger would occur on February 20.[23] The next week, QuarterNorth notified its Common Stock and Warrant holders that the merger was expected to close by the end of February, subject to certain conditions being satisfied.[24]

## D. This Litigation

On February 7, the plaintiffs filed this action and sought injunctive relief.[25] In their Complaint, the plaintiffs allege that the Drag-Along Provision of the Stockholders Agreement is being improperly invoked. Counts I and II of the six-count Complaint seek to enjoin the Drag-Along Sellers from pursuing the proposed Drag-Along Sale as to the plaintiffs and request related declaratory relief.[26]

Exemplifying the best traditions of the Delaware bar, the parties agreed to expedite this matter and proceed towards a preliminary injunction hearing.[27] On

---

[22] Drag-Along Sale Notice ¶ 1.

[23] Compl. ¶ 84.

[24] *Id.*; *see* Compl. Ex. K.

[25] Dkt. 1.

[26] Compl. ¶¶ 86-91, 94-101, 104-107.

[27] *See* Dkt. 35.

February 12, the plaintiffs filed a motion for a preliminary injunction with an opening brief and affidavits in support.[28] The defendants filed an answering brief in opposition to the motion on February 15, and the plaintiffs filed a reply brief on February 17.[29] On February 19, I heard oral argument on the motion, which was taken under advisement.[30]

## II. LEGAL ANALYSIS

A preliminary injunction is an "extraordinary form of relief."[31] It is only available "where the movant[] demonstrate[s]: (1) a reasonable probability of success on the merits at a final hearing; (2) an imminent threat of irreparable injury; and (3) a balance of the equities that tips in favor of issuance of the requested relief."[32] Although "[a] strong showing on one element may overcome a weak showing on another element," the failure to prove any element "will defeat the application."[33] None support a grant of injunctive relief here.

---

[28] Dkt. 24.

[29] Dkts. 37, 39.

[30] Dkt. 44.

[31] *Next Level Commc'ns, Inc. v. Motorola, Inc.*, 834 A.2d 828, 845 (Del. Ch. 2003).

[32] *HighTower Hldg., LLC v. Gibson*, 2023 WL 1856651, at *5 (Del. Ch. Feb. 9, 2023) (quoting *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *3 (Del. Ch. Oct. 26, 2018)).

[33] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998).

## A.      Reasonable Probability of Success

To demonstrate that they have a "reasonable probability" of success, the plaintiffs must prove that they are "more likely than not entitled to relief."[34]  The plaintiffs argue that they are likely to prevail on Counts I and II of the Complaint.[35]  These claims center around the terms of the Stockholders Agreement and Warrant Agreements in view of the proposed Drag-Along Sale.

"Delaware adheres to the 'objective' theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[36]  The court must read the contract "as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'"[37]  "When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions."[38]  "An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."[39]

---

[34] *C&J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Trust*, 107 A.3d 1049, 1067 (Del. 2014).

[35] *See* Compl. ¶¶ 86-91, 94-101, 104-107; Pls.' Opening Br. 15.

[36] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).

[37] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[38] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010)).

[39] *Osborn*, 991 A.2d at 1160.

### 1. Whether the Merger Agreement and Drag-Along Sale Notice Are Consistent with the Relevant Contracts

The Drag-Along Provision in Section 3.03(a) of the Stockholders Agreement applies where "holders of Common Stock and [] Warrants" with "50% or more of the Aggregate Common Stock" (defined as the Drag-Along Sellers) propose to "Transfer shares of Common Stock," including through "a sale of equity interests, merger or sale of all or substantially all assets."[40] If the provision is triggered, the Drag-Along Sellers may force Other Stockholders to take (or refrain from taking) certain actions.[41] The Drag-Along Sellers can, "at their option," cause Other Stockholders to: (i) "sell" Common Stock and Warrants on the same terms as the Drag-Along Sellers; (ii) "vote" shares under certain conditions; (iii) "execute and deliver" documentation related to the Drag-Along Sale; (iv) "exercise" Warrants "immediately prior to the consummation of the Drag-Along Sale"; (v) "not deposit" shares or Warrants in a voting trust or subject them to any arrangements or agreements; and (vi) "waive, and refrain from exercising, any dissenters' rights or rights of appraisal."[42]

The Drag-Along Sale Notice requires the Other Stockholders to take some of the actions enumerated in Section 3.03(a): to "vote," "execute and deliver"

---

[40] Stockholders Agreement § 3.03(a).

[41] *See id.* § 3.03(a)(i)-(vi).

[42] *Id.*

11

documentation, "not deposit" Common Stock or Warrants, and "waive" dissenters'

or appraisal rights.[43] It also contemplates the "transfer [of all other] shares of

Common Stock and [] Warrants owned by [an] Other Stockholder in the Drag-Along

Sale on the same terms and conditions as the Drag-Along Sellers."[44]

A "transfer" is not one of the six actions enumerated in the Drag-Along

Provision that the Drag-Along Sellers can impose on Other Stockholders. Thus, the

plaintiffs contend that the Drag-Along Sale Notice contravenes the Stockholders

Agreement and amounts to a conversion of equity that is prohibited by Sections 7(a)

and (b) of the Warrant Agreements.[45] The plaintiffs are not reasonably likely to

succeed on these arguments.

First, the Merger Agreement tracks the Stockholders Agreement. Section 2.04

of the Merger Agreement states:

> [P]ursuant to Section 3.03(a)(i) of the Stockholders Agreement, each
> Company Warrant will automatically, and without any further act of the
> holder thereof, be converted immediately prior to Closing into the right
> to receive the amount that would have been payable had such Company
> Warrant been exercised immediately prior to the Closing and converted
> into the right to receive . . . the Per Share Consideration . . . minus the

---

[43] Drag-Along Sale Notice ¶¶ 2-5.

[44] *Id.* ¶ 1.

[45] *See* Pl.'s Opening Br. 18-19; Pls.' Reply Br in Further Supp. of Pls.' Mot. for a Prelim. Inj. (Dkt. 39) ("Pls.' Reply Br.") 4.

aggregate exercise price payable for the exercise of such Company Warrant[.][46]

The plaintiffs read this language as requiring the Warrants to be treated as exercised, even though the Drag-Along Sale Notice does not specifically mention the exercise of Warrants.[47]

But Section 3.01(a)(i) includes a proviso after the text permitting the Drag-Along Sellers to cause Other Stockholders to "sell" Common Stock and Warrants. It provides that, if the Drag-Along Sellers do not force the exercise of Other Stockholders' Warrants in the Drag-Along Sale, they may require the Other Stockholders to accept the consideration that would have been received if the Other Stockholders had exercised their Warrants before the Drag-Along Sale and sold them as Common Stock (minus the exercise price).[48] Section 2.04 of the Merger Agreement is in accord.

Second, the "transfer" contemplated by the Drag-Along Sale Notice is effectively a "sale" under Section 3.01(a)(i) of the Stockholders Agreement. A "sale" is "[t]he transfer of property or title for a price."[49] The operative paragraph

---

[46] Merger Agreement § 2.04. "Per Share Consideration" means, subject to withholdings under Section 2.10, "the amount equal to (a) the Per Share Cash Consideration plus (b) the Per Share Parent Stock Consideration." *Id.* § 1.01.

[47] *See* Pls.' Opening Br. 4, 19.

[48] Stockholders Agreement § 3.01(a)(i); *see supra* note 15 and accompanying text.

[49] *Sale*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Calpine Corp. v. Bank of N.Y.*, 895 A.2d 880, 895 (Del. Ch. 2005) (describing a "'sale' as the 'transfer of property or title

in the Drag-Along Sale Notice describes a "transfer" of Common Stock and Warrants "on the same terms and conditions as the Drag-Along Sellers."[50] These "terms and conditions" include the transfer of Common Stock and Warrants for a price—the merger consideration—that is the same obtained by the Drag-Along Sellers from Talos (the Drag-Along Buyer).[51] This comports with Section 3.03(a)(i) of the Stockholders Agreement.

The plaintiffs reject the notion that the transfer discussed in the Drag-Along Notice is equivalent to a sale, arguing that a "conversion" of equity does not implicate "an actual *sale* and an actual *buyer*" of the interests.[52] Individual shares of stock are not, however, "sold" in a typical merger. They are converted into the right to receive merger consideration.[53]

for a price'" (citation omitted)), *aff'd in part, rev'd in part sub nom. Wilm. Trust Co. v. Calpine Corp.*, 906 A.2d 807 (Del. 2005) (TABLE); *Willis v. City of Rehoboth Beach*, 2005 WL 1953028, at *5 (Del. Super. June 24, 2005) (same).

[50] Drag-Along Sale Notice ¶ 1.

[51] The Drag-Along Sale Notice states that the transfer of securities will be conducted pursuant to the Merger Agreement, which contemplates the transfer of the securities for a price. *See id.*; Merger Agreement Item 1.01.

[52] Pls.' Reply Br. 5.

[53] *See generally Swift v. Houston Wire & Cable Co.*, 2021 WL 5763903, at *1 (Del. Ch. Dec. 3, 2021) ("At the Effective Time, each issued and outstanding share of [the company's] common stock would be cancelled and converted into the right to receive merger consideration of $5.30 in cash."); *In re P3 Health Gp. Hldgs., LLC*, 2022 WL 16548567, at *12 (Del. Ch. Oct. 31, 2022) ("[W]hen the merger became effective, the [] units were converted into the right to receive a mixture of cash and stock in [the buyer]."); *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1257 (Del. 2004) ("In

Section 2.03 of the Merger Agreement provides that shares of QuarterNorth stock will be "converted into the right to receive the Per Share Consideration."[54] Although the Drag-Along Sale Notice outlines a "transfer" for shares of Common Stock, the plaintiffs only challenge its application to the Warrants. The only difference is that the proviso of Section 3.03(a)(i) treats the Warrants as if they were converted twice: first into shares of Common Stock pre-closing, and then into the right to receive merger consideration.[55]

Finally, the transfer (or conversion) of the Warrants is not barred by the Warrant Agreements. The plaintiffs claim that the transaction documents run afoul of the roll-through right and protections afforded by Sections 7(a) and (b) of the Warrant Agreements.[56] To be sure, the Warrant Agreements contemplate that Warrants roll through in the event of a merger.[57] But they also confirm that the Stockholders Agreement, which contains the Drag-Along Provision, is binding on

---

the Merger, each outstanding publicly owned share of [the seller's] stock was converted into the right to receive $14.00 in cash.").

[54] Merger Agreement § 2.03(a); *see supra* note 46 (defining "Per Share Consideration").

[55] *See* Stockholders Agreement § 3.03(a)(i); *see also Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 708 (Del. Ch. 2004) ("The most obvious reading of the Warrants is that they grant Warrantholders the right to receive the same merger consideration that they would have received if they had converted immediately before the [m]erger."), *aff'd*, 861 A.2d 1251 (Del. 2004).

[56] *See* Pls.' Reply Br. 4, 14-15.

[57] Warrant Agreements § 7(a).

Warrant holders.[58]  Section 3.03(a) of the Stockholders Agreement likewise addresses the treatment of Warrants in a merger.[59]

The Warrant Agreements can be read harmoniously with the Stockholders Agreement. The Drag-Along Provision is not automatically exercised in the event of a merger.[60]  If it were not invoked, Warrants would roll through in a merger as "the right to receive upon exercise" the merger consideration under Section 7(a) of the Warrant Agreements.[61]  But if the Drag-Along Provision were triggered, Section 7(a) of the Warrant Agreements would no longer be an "applicable provision" under Section 7(b) that the Company must contract to protect in a merger agreement.[62]

> 2.  Whether the Drag-Along Provision Applies to Plaintiffs Who Only Hold Warrants

The plaintiffs argue that, even if the Drag-Along Sale Notice and Merger Agreement comport with the Stockholders Agreement, the Drag-Along Provision cannot apply to certain minority investors.  Section 3.03(a) of the Stockholders

---

[58] *See id.* § 3(c).

[59] *See* Stockholders Agreement § 3.03(a)(i), (iv), (v).

[60] *See* Jason Breen, Amy L. Simmerman, Brad Sorrels & Jason B. Schoenberg, *Client Advisory: How to Navigate the Decision of Exercising Drag-Along Rights During an M&A Process*, WILSON SONSINI (Sept. 27, 2022), https://www.wsgr.com/en/insights/how-to-navigate-the-decision-of-exercising-drag-along-rights-during-an-manda-process.html#3 ("Although one would think that triggering drag-along provisions in connection with a sale transaction would occur often given the protections it affords, these provisions are rarely utilized.").

[61] Warrant Agreements § 7(a).

[62] *Id.* § 7(b).

Agreement defines the Other Stockholders who can be dragged as "each other holder of Common Stock *and* [] Warrants."[63] The plaintiffs read the provision to exclude those who hold only Warrants (i.e., no shares of Common Stock).[64] Their argument turns on the construction of the word "and" in the definition of Other Stockholders.[65]

The meaning of the word "and" seems straightforward. Yet it has spawned a "lively debate" across jurisdictions over its use "in legal drafting."[66] In *Weinberg v. Waystar, Inc.*, the Delaware Supreme Court undertook a meticulous exploration of the word's usage.[67] The court outlined "two avenues of interpretation—the 'conjunctive or disjunctive' path and the 'joint or several' path."[68]

"And" is ordinarily conjunctive; "or" is ordinarily disjunctive.[69] Courts usually interpret "and" as conjunctive unless it produces "an absurd or unreasonable result" or upsets the "parties' intent and reasonable expectations."[70] Here, the parties

---

[63] Stockholders Agreement § 3.03(a) (emphasis added).

[64] *See* Pls.' Opening Br. 20-22.

[65] The plaintiffs initially alleged that the Drag-Along Defendants could not be Drag-Along Sellers since those owning "stock and warrants hold less than 50% of the Company's common stock." Compl. ¶ 93. After discovery, this argument was withdrawn. *See* Pls.' Opening Br. 13-14.

[66] *See Waystar*, 294 A.3d at 1058 (detailing various courts' interpretations of "and"); *see also Pulsifer v. United States*, 143 S. Ct. 978 (2023) (granting certiorari to resolve a circuit split over the construction of "and" in a statute).

[67] 294 A.3d 1039.

[68] *Id.* at 1044-45.

[69] *Id.* at 1045 (citing *Silverman v. Silverman*, 206 A.3d 825, 832 n.35 (Del. 2019)).

[70] *Id.*

agree that the "and" in the definition of Other Stockholders is conjunctive.[71] Neither reads the word as providing that Other Stockholders are either Common stock *or* Warrant holders. Nor do I.

Instead, the parties' interpretations diverge over whether "and" is joint or several. The "several 'and' denotes A and B, jointly or severally"; the "joint 'and' denotes A and B, jointly but not severally."[72] To use an example from *Waystar*, offering a guest "a yogurt, a muffin, and a bagel" would mean that one could take any, all, or none of the items. In that example, the "and" is several. If it were joint, the guest would be required to take all three of the items.[73] The joint approach would be inconsistent with common English usage (absent a particularly overbearing host).

A joint "and" in the definition of Other Stockholders would mean that the Drag-Along Provision applies only to a subset of minority investors that simultaneously own two kinds of securities: Common Stock and Warrants. A several "and" would mean that it applies to holders of Common Stock, Warrants, or both.[74] The joint construction, advanced by the plaintiffs, is unlikely to apply. It is unsupported by the plain terms and context of Section 3.03(a) of the Stockholders

---

[71] Defs.' Answering Br. in Opp'n to Pls.' Mot. for Prelim. Inj. (Dkt. 37) 22 n.13; Pls.' Opening Br. 20.

[72] *Waystar*, 294 A.3d at 1046.

[73] *See id.* at 1059.

[74] *See* Pls.' Opening Br. 20-21.

Agreement, is inconsistent with other parts of the Drag-Along Provision, and risks an unreasonable result.

a. The Terms of Section 3.03(a)

Drag-along provisions are common in stockholder agreements and enable a majority to force the closing of a change-of-control transaction.[75] They "often require that minority stockholders take actions that are reasonably necessary to close a merger," such as "voting in favor of the merger or providing written consent."[76] Section 3.03(a) of the Stockholders Agreement does just that. If the Drag-Along Sellers trigger the drag-along mechanism by proposing a transaction, they may cause Other Stockholders to take certain enumerated actions.

The specific actions contemplated by the Drag-Along Provision support a several interpretation of the word "and" in the definition of Other Stockholders. Some of the actions described in the Drag-Along Provision are specific to holders of Common Stock. Section 3.03(a)(ii) of the Stockholders Agreement permits the Drag-Along Sellers to require Other Stockholders to vote "all shares of Common Stock" they own or exercise voting power over in favor of a Drag-Along Sale.[77] Some of the actions described in the Drag-Along Provision are specific to Warrant

---

[75] *See SV Inv. P'rs, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 991-92 (Del. Ch. 2010).

[76] *Manti Hldgs.*, 261 A.3d at 1224.

[77] Stockholders Agreement § 3.03(a)(ii).

holders. Section 3.03(a)(iv) allows the Drag-Along Sellers to require Other Stockholders to "exercise any [] Warrants . . . immediately prior to the consummation of the Drag-Along Sale."[78] And some apply to holders of both Warrants and Common Stock. Under Section 3.03(a)(i), the Drag-Along Sellers may require Other Stockholders to "sell a number of shares of the Common Stock and [] Warrants owned by such Other Stockholder" to the buyer "to whom the Drag-Along Sellers propose to sell their shares of Common Stock *and/or* [] Warrants . . . on the same terms and conditions as the Drag-Along Sellers."[79] This provision contemplates that the Drag-Along Sellers can drag stockholders in a sale of Common Stock, Warrant holders in sale of Warrants, or both.

Further, Section 3.03(a)(iv) of the Stockholders Agreement allows the Drag-Along Sellers to require the exercise of "*any* [] Warrants held by the Other Stockholders."[80] If Other Stockholders must hold both Common Stock and Warrants, the inclusion of the word "any" would be nonsensical.[81] By the plaintiffs' logic, Other Stockholders *must* own Warrants.[82] The plaintiffs would have me read

---

[78] *Id.* § 3.03(a)(iv).

[79] *Id.* § 3.03(a)(i) (emphasis added).

[80] *Id.* § 3.03(a)(iv) (emphasis added).

[81] *Osborn*, 991 A.2d at 1159.

[82] *See* Compl. ¶ 4.

20

"any" as "every." But if "any" Warrant meant "every" Warrant, the phrase "held by the Other Stockholders" would be surplusage.[83]

b.       The Role of the Drag-Along Provision

The plaintiffs' interpretation of Other Stockholders would undermine the structure and function of the Drag-Along Provision. If a minority investor held Common Stock but not Warrants, the Drag-Along Sellers would be unable to cause it to vote in favor of a Drag-Along Sale. If the investor held Warrants but not Common Stock, the Drag-Along Sellers could not cause it to exercise its Warrants before a Drag-Along Sale. Instead, only the subset of minority investors with Warrants *and* Common Stock would be subject to the drag-along mechanism.[84]

This approach would impose an illogical (and seemingly arbitrary) distinction between the parties that can and cannot be dragged.[85] The Drag-Along Provision would not result in a completed merger or sale. Instead, the remaining holders with only Common Stock or Warrants would maintain outsize influence simply because they lack both types of securities.

---

[83] Stockholders Agreement § 3.03(a)(iv); *see Capella Hldgs., LLC v. Anderson*, 2017 WL 5900077, at *7 (Del. Ch. Nov. 29, 2017).

[84] The plaintiffs argue that the "even if the Drag-Along Sale were proper as to some Plaintiffs, it cannot bind the Warrant-Only Plaintiffs." Pls.' Opening Br. 20. This argument is flawed under the plaintiffs' own position that the Drag-Along Provision only applies to holders of both Common Stock and Warrants.

[85] *See Manti Hldgs.*, 261 A.3d at 1208 (citing *Osborn*, 991 A.2d at 1160).

21

The plaintiffs believe that their interpretation of Section 3.03(a) of the Stockholders Agreement imposes "rough justice" by requiring "an alignment of interest to avoid . . . significant stockholders [from] entering into a deal that prejudices Warrant holders."[86] But as the plaintiffs acknowledge, the Drag-Along Defendants include owners of Common Stock and Warrants.[87] In any event, the plaintiffs' view that the Drag-Along Provision is meant to protect Warrant holders—not to drag along minority investors—is unsupported by Stockholders Agreement's plain terms.

### c. Other Terms of the Drag-Along Provision

To read the "and" in the definition of Other Stockholders as joint, rather than several, is also inconsistent with other portions of the Drag-Along Provision.[88]

For example, Section 3.03(b) refers to the "consideration to be paid in exchange for the shares of Common Stock or [] Warrants pursuant to [] Section 3.03" as including "any securities and due receipt thereof by any holder of Common Stock

---

[86] Feb. 19, 2024 Prelim. Inj. Hr'g Tr. (Dkt. 50) 17.

[87] Pls.' Opening Br. 20. Further, Section 3.03(d)(iii) of the Stockholders Agreement provides that the Other Stockholders will receive "the same form of consideration . . . as is received by the Drag-Along Sellers." Stockholders Agreement § 3.03(d)(iii).

[88] *See Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*, 996 A.2d 1254, 1260 (Del. 2010) ("[A] single clause or paragraph of a contract cannot be read in isolation, but must be read in context." (quoting *Cheseroni v. Nationwide Mut. Ins. Co.*, 402 A.2d 1215, 1217 (Del. Super. 1979), *aff'd*, 410 A.2d 1015 (Del.1980))).

*or* [] Warrants."[89] The "or" in the latter phrase would be illogical if the plaintiffs' construction of Other Stockholders applied. In the plaintiffs' view, there could be no such thing as an Other Stockholder with Common Stock or Warrants.

Additionally, Section 3.03(d)(i) states that a "Drag-Along Sale must include all Other Stockholders."[90] This requirement would be meaningless under the plaintiffs' interpretation, which would not ensure a successful drag because only a subset of minority investors would be affected.

### B. Irreparable Harm

A showing of imminent, irreparable harm is necessary for preliminary injunctive relief to issue.[91] Irreparable harm is "generally defined as harm for which there can be no remedy at law, which is 'typically taken to mean that an award of compensatory damages will not suffice.'"[92] An injury may also be irreparable if "a later money damage award would involve speculation" or be so inadequate that it would amount to a denial of justice.[93]

---

[89] Stockholders Agreement § 3.03(b) (emphasis added).

[90] *Id.* § 3.03(d)(i).

[91] *See Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1090 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005).

[92] *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2012 WL 6681994, at *4 (Del. Ch. Dec. 21, 2012) (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 10.02(b)(4), at 10–17 (2012)).

[93] *Hollinger Int'l*, 844 A.2d at 1022; *see also Renco Gp.*, 2012 WL 6681944, at *4.

The plaintiffs assert that if the Drag-Along Sale is not enjoined, they will lose the "unique and incalculable value" of optionality associated with their Warrants.[94] If the Warrants roll through post-closing as contemplated by the Warrant Agreements, the plaintiffs can choose when to exercise them for the merger consideration of cash and Talos shares. But if the Drag-Along Sale proceeds, the plaintiffs aver that it would be "unduly difficult and speculative" to calculate the present value of that lost opportunity.[95]

The plaintiffs acknowledge that they will—at some point—receive the merger consideration. The key issue is when they will receive it, which affects the timing of recognizing losses or gains in their positions.[96] The tax consequences of recognition of cash or effects of dilution could, however, be remedied through money damages. Although quantifying any losses may be challenging, "[t]he law does not require certainty . . . so long as the court has a basis to make a responsible estimate of damages."[97]

---

[94] Pls.' Opening Br. 24.

[95] *Id.* at 25.

[96] *See* Compl. ¶ 69.

[97] *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992).

The plaintiffs rely on *Boesky v. CX Partners, L.P.* as the primary authority for their argument that the loss of a strategic opportunity is unquantifiable.[98] There, the court assessed whether a proposed distribution plan for a defunct partnership contravened the express terms of its partnership agreement.[99] A noteholder sought injunctive relief to protect its right under the agreement to prevent any distribution to limited partners while the partnership remained in default on the notes.[100] Chancellor Allen concluded that the proposed distribution plan would be a "clear violation" of the entity's obligation to the noteholder, and viewed the noteholder's loss of bargained-for leverage as an injury for which "no money damage award could reliably be calculated to compensate."[101]

But no such bargained-for leverage is at risk of being lost here.[102] The Warrant holders negotiated Warrant Agreements that allowed the Warrants to roll through a merger. But they also agreed that the Stockholders Agreement applied,

---

[98] 1988 WL 42250, at *7, 14 (Del. Ch. Apr. 28, 1988).

[99] *Id.* at *10. The proposed modifications changed the pro-rata distribution plan under the agreement to a non-pro-rata plan that, given the liabilities of the partnership and its lack of adequate funds to return all of the capital contributions of all the relevant partners, would result in a breach of the agreement. *Id.*

[100] *Id.* at *14.

[101] *Id.* at *15.

[102] *See supra* notes 56-62 and accompanying text.

25

which includes a Drag-Along Provision that could cause them to sell or exercise their Warrants.

## C. Balance of the Equities

The final element of the injunction test requires the court to undertake a "pragmatic balancing of the equities . . . based on the facts of this case."[103] An injunction is only available if the plaintiff demonstrates that the "failure to grant the injunction will cause it greater harm than granting the injunction will cause the other party."[104] This element presents the clearest cut basis to deny the plaintiffs' request for preliminary injunctive relief.

The plaintiffs insist that they "do <u>not</u> seek to enjoin the merger from closing" but only to prevent their "forced participation in the Drag-Along Sale."[105] I do not doubt their intentions. But to enjoin the Drag-Along Sale puts the $1.6 billion merger at risk.

Section 8.01(b)(i)(A) of the Merger Agreement states that "[t]he obligation of [Talos] to consummate the Closing is subject to the satisfaction of . . . the Fundamental Warranties of [QuarterNorth] contained in this Agreement."[106]

---

[103] *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *26 (Del. Ch. May 20, 2011).

[104] *Id.* (cleaned up).

[105] Pls.' Opening Br. 26.

[106] Merger Agreement § 8.01(b)(i)(A).

"Fundamental Warranties" is a defined term, which includes "the representations and warranties contained in . . . Section 3.03."[107] Section 3.03, in turn, states that "the Transaction will constitute a Drag-Along Sale, [and] each Company Warrant will automatically, and without any further act of the holder thereof, be converted immediately prior to Closing . . . ."[108] If the Drag-Along Sale is enjoined, then Section 3.03 of the Merger Agreement may be unmet and Talos could have grounds not to close.

The plaintiffs' loss of control over when they receive the merger consideration is significantly outweighed by the potential loss of the merger—a transaction deemed desirable by most of QuarterNorth's investors.[109] The equities therefore do not support an injunction.[110]

## III. CONCLUSION

For the reasons set forth above, the plaintiffs' motion for a preliminary injunction is denied.

---

[107] *Id.* § 1.01.

[108] *Id.* § 3.03(a)(i)-(ii).

[109] *See* Dkt. 46 (reporting that just over 93% of QuarterNorth's outstanding stockholders voted in favor of the merger on February 20).

[110] *See Smurfit-Stone*, 2011 WL 2028076, at *26 (explaining that the equities weighed against an injunction where it "would create a risk that [the company's] stockholders could lose out on th[e] [t]ransaction altogether"); *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *20 (Del. Ch. Mar. 6, 2012) (denying a motion for a preliminary injunction including because a "renegotiated deal may yield . . . a loss of the [m]erger entirely").